**MARRIOTT CORPORATION, a Delaware corporation, Plaintiff,**

v.

**SIMKINS INDUSTRIES, INC., a Delaware corporation; and Leon Simkins, Defendants.**

**No. 92–2541–CIV.**

United States District Court, S.D. Florida, Miami Division.

Jan. 24, 1996.

Kirk Burns, Douglas Halsey, Law Offices of Douglas Halsey, Miami, Florida, for Plaintiff.

Mark Kobelinski, Stephen Verbit, Earl, Blank, Kavanaugh & Stotts, Miami, Florida, for Defendants.

### *FINAL JUDGMENT*

FERGUSON, District Judge.

This action for recovery of pollution cleanup costs was tried nonjury for thirteen days beginning October 30, 1995 and ending November 17, 1995. Plaintiff, Host Marriott Corporation, f/k/a Marriott Corporation ("Marriott"), incurred the costs in removing industrial wastes and other contaminants

from property Defendant, Simkins Industries, Inc., sold to Marriott in 1981. Marriott sued Simkins Industries and its controlling officer, director, and shareholder, Defendant Leon Simkins under Sections 107 and 113 of the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. Section 9601 *et seq.* ("CERCLA"), and Section 7002 of the Resource Conservation and Recovery Act, 42 U.S.C. § 6972 ("RCRA").[1] Defendants Simkins Industries and Leon Simkins filed a counterclaim under Section 7002, RCRA.[2] This Court has jurisdiction pursuant to 42 U.S.C. § 9613(b) and 42 U.S.C. § 6972.

### Findings of Fact

On June 4, 1981, Marriott purchased a 4.3 acre parcel of undeveloped commercial property (the "Property") from Simkins Industries. The Property is located just east of Miami International Airport at the southeast intersection of N.W. 39th Avenue and N.W. 28th Street in Miami, Florida.

From 1951 through 1981, Simkins Industries, and its predecessor, Miami Paper Board Mills, Inc. ("Miami Paper Board"), operated a paper board manufacturing plant on the property. Several other affiliates of Simkins Industries also did business at the site prior to 1981. Benner Box Company operated a box manufacturing plant on the northwestern portion of the Simkins Property from the 1940's through 1981, and Simco Waste Paper Company ("Simco") did business at the site from the 1950's through the mid–1980's. During the late 1950's, a company known as Dixie Printing Ink Manufacturing Company also operated an ink manufacturing business on the northern side of the Simkins Property, where it mixed inks for sale to local printing companies.

Defendant Leon Simkins is the current president and controlling shareholder of Simkins Industries. In March 1948, he became the general manager of Miami Paper Board. At that time, Sam Simkins, Leon Simkins' father, was the president of Miami Paper Board. Leon Simkins was subsequently promoted to vice president and in 1956 to president of Miami Paper Board. Prior to the merger of Miami Paper Board into Simkins Industries in 1963, Miami Paper Board was a closely held corporation. Leon Simkins owned approximately 38% of the stock of Miami Paper Board and the remaining two thirds were shared by Leon Simkins' brother and sister. Simkins also served on the board of directors of Miami Paper Board, was an officer and shareholder of Benner Box Company and Simco, and was a major shareholder of Dixie Printing Ink Manufacturing Company.

As president, controlling shareholder, and director of Miami Paper Board Mills and Simkins Industries during the times of disposal, Leon Simkins had actual authority and did control the mill's operations on a day-to-day basis. Prior to 1963, Leon Simkins worked full time at the mill and was present there on a daily basis. He exercised authority over all aspects of the mill's operations, including waste disposal.

Miami Paper Board's primary business was recycling used paper into cardboard. The process entailed combining pulverized used newspapers, magazines and boxes with vast quantities of water, thereby: (a) reducing the paper into a pulp stock; (b) passing the pulp through large tanks where it was cleaned and refined; and (c) drying the pulp and pressing it into rolls of cardboard.

---

**1.** Marriott's Count IV based on RCRA Section 7002(a)(1)(B) was dismissed prior to trial. This section gives federal courts subject matter jurisdiction to hear citizen suits where specific equitable remedies such as injunctions are sought. RCRA's goal is to prevent the creation of waste sites rather than to promote the cleanup of existing ones. *Furrer v. Brown,* 62 F.3d 1092 (8th Cir.1995).

**2.** The Court also granted Plaintiff's motion to dismiss the counterclaim. Plaintiff Marriott was a subsequent purchaser of previously contaminated property and was unaware of the presence of underground pits containing polluting debris when it purchased the property. While Marriott delayed in taking action to remediate the harm, it was not for that reason a "contributor" under RCRA. Delay in taking remedial action upon discovery of contamination caused by a previous owner does not constitute wrongful handling or storage of hazardous wastes. *First San Diego Properties v. Exxon, Co.,* 859 F.Supp. 1313 (S.D.Cal.1994).

The mill used continuous feed and batch pulpers to shred the used newspapers and magazines into a solution consisting of approximately 90% water and 10% pulp. The pulper, resembling a large blender, had a 2000 gallon capacity. The used paper purchased by the mill often contained trash and debris such as metal, plastic, rags, wire, bottles, and wood. In operation, the pulpers had devices for removing the debris by snaring and trapping. The receptacles holding the debris would be emptied approximately every 12 to 24 hours.

After its initial pulping, the paper stock was further pulverized, or "refined," and cleaned before being readied for pressing into cardboard. Paper stock from the pulper passed through a series of narrow meshed screens, refiners, and centrifugal cleaners, before emptying into the paperboard making machine itself. The cleaners and screens were periodically emptied of the dirt, grit, staples and other bits of debris collected during the refining process.

In addition to dirt and debris, the cleaners and screens also filtered kaolin clay from the paper pulp stock. Unlike newspaper, magazine paper is coated with a solution made with kaolin clay to make it bright and smooth for color printing. During the pulping process, the clay coating is separated from the paper fibers and is screened out along with other bits of debris caught in the mill's cleaners and screens.

During the recycling process, mill waste water, known as "white water" because of the color the residual pulp in the water, is discharged. Prior to 1963, untreated mill whitewater was discharged into an open ditch, running length-wise down the property's eastern border, towards the Tamiami canal. In response to complaints from Dade County's pollution control officials, however, Miami Paper Board built a "clarifier" outside its main building to remove and reuse pulp fibers from the whitewater, and to discharge the waste water into the Tamiami canal without additional treatment.

Records maintained by Dade County, Department of Environmental Resources Management ("DERM"),[3] reflect that the company's clarifier frequently malfunctioned, resulting in paper pulp sludge and whitewater flooding the mill and the area that ultimately would be sold to Marriott. A County inspection report dated February 1969 documents levels of paper pulp sludge "knee deep" in the area of the Marriott property. Problems with the clarifier continued through October 1978, when a DERM inspector reported accumulated sludge at the property "so deep as to preclude walking over the surface."

In 1990, Marriott attempted to sell the property. During the course of a potential buyer's due diligence search, soil and groundwater tests were conducted which revealed the presence of potential contamination. A copy of the buyer's environmental audit was sent anonymously to Dade County's local pollution control agency, DERM. In March 1991, Marriott received notice from DERM that a pile of soil left at the site from the environmental audit indicated the presence of pollutants. Marriott was directed by DERM to assess the soil and take additional soils samples from the site to verify the existence or nonexistence of contaminants.

Marriott retained the environmental consulting firm of SCS Engineers ("SCS") to conduct the required assessment of the soil pile and suspect area site. Soil borings collected by SCS revealed elevated levels of lead and petroleum hydrocarbons in soils beneath the parking lot. As a result, DERM directed Marriott to expand its assessment. Over the course of the next 16 months, split spoon soil borings were collected from over most of the site, and SCS conducted soil and groundwater sampling and analysis, test pit excavations, and electromagnetic and resistivity surveys. The results of Marriott's assessment are documented in detail in a voluminous series of DERM-approved reports entitled Preliminary Contamination Assessment Report ("PCAR"); Supplemental Con-

---

**3.** DERM is a State-approved local pollution control program created pursuant to Section 403.182, Florida Statutes (1994). In accordance with Section 403.182(7), violation or failure to comply with a rule, regulation or order adopted by a local pollution control program more strict or stringent than federal law is punishable under state law.

tamination Assessment Report ("SCAR"); Risk Assessment, Remedial Action Plan ("RAP"); Remedial Action Plan Addendum ("RAP Addendum"); and Remedial Action Closure Report ("Closure Report").

Marriott's cleanup of the property unearthed thick layers of a gray, clay-like material. Subsequent chemical assessment of the material disclosed kaolinite (the mineral comprising kaolin clay), cellulose fibers, titanium, chromium, dioxin, isomers, PCBs, and elevated levels of lead and other heavy metals.

Marriott also discovered stacks of old newspapers from 1958 to 1965 buried at the site. Long strands of wire intertwined with rags were found, corresponding to descriptions of the waste a pulping machine "ragger" would remove. A mixture of bottles, office trash and other debris was unearthed consistent with the type of material that was removed in the pulping process. Globs of inks, pigments, and ink containers were found buried next to newspapers dated from the late 50's and early 1960's—the time period that Dixie Printing Ink did business at the site. One article of evidence definitively linking the debris to the defendants was half of an American Express Card bearing the company name, Miami Paper Board, and the name of the mill's general manager found buried several feet deep at the site, beneath a parking lot, amidst the inks, sludges, debris and other industrial wastes.

William Ginn, a paper industry expert retained by Marriott, concluded that the chemical content and physical characteristics of the material established that it was old paper pulp sludge, most likely taken from the screens and centrifugal cleaners used by Miami Paper Board. Ginn further testified that waste mill sludge coming from screens and cleaners before 1980 would contain high levels of lead. Prior to 1980, pigments used in the manufacture of colored inks contained high levels of lead, chromium and other heavy metals. Lead containing pigments would be bound with the kaolin coating found on magazine stock and would be released during the paper stock cleaning process used by the mill. The presence of dioxin, a by-product of paper-making in general and polychlorinated biphenyls ("PCBs"), a component

of carbonless paper, further confirmed that the buried material was mill sludge from the operations of Simkins Industries and its predecessor.

Marriott's initial assessment of the property revealed an old debris pit in the southwest portion of the site, measuring approximately 180 feet long, 75 feet wide, and 8 feet deep. This area of the site was labeled Area C. Test pits excavated in the debris pit area revealed the pulp sludges, inks, stacks of old newspapers, debris, and other industrial waste. Soil borings collected from within the debris pit area revealed wide-ranging levels of lead and PCBs. Total lead levels reached levels to over 6000 parts per million ("ppm"). Soil samples tested using the Toxicity Characteristic Leaching Procedure ("TCLP") disclosed lead levels of 12.0 milligrams per liter (mg/l)—above EPA's 5.0 mg/l standard for lead laden waste to be deemed hazardous under federal standards and in some places above DERM's 0.05 mg/l TCLP standard for lead in soil. PCB's were found at 40.0 ppm—well above DERM's 1.0 ppm standard for soil and approaching the 50 ppm level that would have required treatment and disposal at an out-of-state facility licensed under the Federal Toxic Substances Control Act ("TSCA"). The source of these high levels was determined to be the debris material, specifically the paper pulp sludge.

Outside of the debris pit area Marriott initially found relatively uncontaminated fill material. Soil borings revealed primarily sands and limestone, occasionally with bits of wood or plastic. The physical characteristics of these borings were markedly different from the sludges and debris and dark-stained soils found in the debris pit area. Soil analysis further revealed the presence of lead, but at levels considerably lower than the pit area. With the exception of two small areas north of the debris pit, labeled Area A and Area B, split spoon soil borings collected from outside the debris pit area tested below 630 ppm for total lead and 5.9 ppm for PCBs.

Groundwater sampling, however, disclosed measurable levels of lead and PCBs at the site. Based on the test results, and the presence of the elevated levels of lead and other contaminants in the debris pit area,

DERM directed Marriott to prepare a Remedial Action Plan including assessment of other areas of the site. As part of its remedial design process, SCS retained toxicologist Dr. Christopher Teaf to perform a risk assessment for the property in order to establish Target Cleanup Levels ("TCLs") for soils remaining after excavation of the debris and industrial wastes. Upon excavation of visible debris and other industrial wastes such as sludge material, confirmation samples of soils were to be collected from the sidewalls of the excavation and tested to determine if the levels of lead, PCBs, dioxins, and petroleum hydrocarbons posed an acceptable health risk. The risk assessment established the following TCLs:

*Soil:*

—Lead = 630 mg/kg

—Total PCBs = 5.9 mg/kg

—Total Petroleum Hydrocarbons (TPH) = 50 mg/kg

—Dioxins = 0.02 micrograms per kilograms (mg/kg)

—Carcinogenic Polynuclear Aromatic Hydrocarbons (PAHs) = 43 mg/kg

—Non–Carcinogenic PAHs = 7,800

*Groundwater:*

—Lead = 50 mg/l (DERM standard)

—Total PCBs = 0.5 mg/l (EPA risk-based concentration and Florida Groundwater Guidance Concentration)

—Total Recoverable Petroleum Hydrocarbons = 5 mg/l (DERM standard)

—Dioxins = 0.01 mg/l (Florida Groundwater Guidance Concentration)

As part of its remedial design process, SCS and Marriott also evaluated six alternative response actions, including excavation, onsite treatment, and capping with an impermeable barrier. Among other factors, Marriott and SCS considered the feasibility of each alternative, its long and short term effectiveness, its ability to protect health and the environment, and its cost effectiveness. Excavation and landfill disposal was determined to be the most cost-effective remedy resulting in a long term and effective response.

This excavation, targeting Area's A, B, and C, began in January, 1993. During the course of the planned excavations, however, it became clear that there were large pockets of buried sludge, pigments, inks, cans, industrial wastes, and other debris which were not revealed by the soil borings. Immediately north of the debris pit area, Marriott unearthed a 30' by 40' area of sludge, ink and debris similar in content and distribution to that found in the debris pit area. Similar pockets of sludge or debris, or both, were found throughout the site in areas identified as D, E, and F which were previously believed to contain only soils and sand. Tests performed on the sludge and pigmented material confirmed it to be of the same type as found in the debris pit. Tests on the pigment and ink nodules also disclosed total lead levels in excess of 40,000 ppm. Subsequent TCLP lead tests performed on the pigment/ink nodules revealed levels as high as 119 mg/l, over 20 times higher than EPA's RCRA hazardous waste level for leachable lead.

Marriott notified DERM of the newly discovered areas of industrial waste and debris. As a result of the discovery, Marriott and DERM agreed that Marriott would continue to excavate until, as provided in the RAP, "all of the visible fill material (i.e., pulp sludge, paper products, paint cans, construction debris) is removed."

The expansion of the excavation was justified by the health risks created by the presence of the materials on the Marriott site. Dr. Christopher Teaf, a toxicologist who has prepared 75–100 risk assessments for governmental agencies, testified that the characterization of pigmentation in the sludge justified "following the sludge" for excavation purposes.[4] While the defendants argued throughout trial that results from discreet samples should be disregarded by the Court, Dr. Teaf testified that average TCL numbers may not be adequate; rather, the high results confirm the sludge as a source of contaminants and as a health risk.

4. Sludge layers containing contaminants did not end at the borders of the Marriott site. Excavation walls showed significant contaminants flowing onto adjacent sites.

DERM representative Marsha Blank also testified that the approval of the RAP's proposal to continue excavation until all of the visible industrial waste was removed was based in part on the fact that such material had been shown to be contaminating. James Carter, another DERM representative, testified that excavation was "not unnecessary" in this case because of the nature of the hazardous waste. Expanded excavation was approved because soil borings and trenching (testing of the walls of already excavated sites) showed industrial waste of the same kind responsible for pollutants in previously delineated areas.

The random burial of the debris by Simkins Industries required Marriott to scrape off the top layer of fill from the whole site in order to find buried industrial wastes, including inks, sludges, and debris. Layers of sludge were in some areas 1 to 2 inches in thickness and in other areas, only yards away, several feet deep. Marriott disposed of the top layer of fill along with the industrial waste debris because it exceeded the State's 108 ppm lead standard for "clean fill" and because it was cost prohibitive to separate surficial soils of varying thicknesses from the industrial wastes immediately below.

On March 21, 1992 and August 24, 1992, Marriott published legal notices requesting public comment on its cleanup plan which included the proposed removal of all visible fill material. In March and September 1992, Marriott also met with Leon Simkins, representing Simkins Industries, and environmental consultants retained by Simkins Industries to explain the cleanup plan. At these meetings, copies of the Remedial Action Plan and Remedial Action Plan Addendum were provided to Simkins Industries. Marriott also requested Simkins Industries to buy back the property, takeover the cleanup, or

pay for it. Although Simkins refused Marriott's request, it did not oppose the planned excavation or dispute the assessment and cleanup plan. In fact, Simkins consultants did not provide any written comments or suggestions to Marriott regarding any of these proposals which were subsequently submitted to DERM. Marriott thus concluded, reasonably, that Simkins Industries and their consultants agreed with Marriott's Remedial Action Plan.

The field work for the excavation and cleanup of the Marriott Property was completed on approximately September 1, 1993. Marriott spent $329,500.00 on the investigation, sampling, analysis, and development of the remedial investigation and feasibility study. The total cost of the cleanup, excavation, and disposal of the hazardous materials, including preparation of the site Closure Report was $2,633,227.00. At trial, it was established by undisputed expert testimony that the amounts charged for assessment and cleanup were reasonable and well within the range charged by other companies performing comparable work.[5]

### Conclusions of Law

■ To establish liability under CERCLA, a private party must prove four elements: (1) the site where the "hazardous substance" is found is a "facility" as that term is defined in 42 U.S.C. Section 9601(9); (2) there has been a "release" or "threatened release" of hazardous substances from the facility; (3) the "release" or "threatened release" has caused the private party to incur "response costs" that were "necessary" and "consistent" with the National Contingency Plan ("NCP"); and (4) the Defendant falls within one of the four classes of parties subject to liability under the Act. *Bunger v. Hartman,* 797 F.Supp. 968, 971 (S.D.Fla.1992).[6]

■ The nature of the materials found on the site, documented fully by plaintiff

---

**5.** The parties stipulated as to the reasonableness of costs for the work that was performed. Simkins reserved the right to challenge administrative costs.

**6.** By order dated March 23, 1995, this Court concluded as a matter of law that (1) Simkins was the owner or operator of the subject facility at the time of disposal of contaminants, (2) the contaminants are hazardous substances as de-

fined in 42 U.S.C. § 9601, (3) the release of hazardous substances from the facility caused Marriott to incur "response costs" that were "necessary" and "consistent" with the National Contingency Plan, 42 U.S.C. § 9607(a)(4)(A), (4) the defendant Simkins falls within one of the four cases of parties subject to liability under the Act, and (5) the plaintiff Marriott did not dispose of "hazardous substances" on the site during its period of ownership or operation of the facility.

Marriott, support this Court's conclusion that the release of these hazardous materials occurred over a twenty year period during Simkins Industries' ownership of the property. Further, Leon Simkins' actual control of the mill's operations makes him individually liable. Corporate officers and directors may be held individually liable for response costs as "operators" under CERCLA. *Levin Metals Corp. v. Parr–Richmond Terminal Co.,* 781 F.Supp. 1454, 1456–57 (N.D.Calif.1991); *United States v. TIC Investment Corp.,* 68 F.3d 1082 (8th Cir.1995).[7]

■ CERCLA provides for recovery of response costs which are "necessary and consistent" with the National Oil and Hazardous Substances Pollution Contingency Plan, 40 C.F.R. § 300 (1994), commonly known as the NCP. The remaining substantive issue in this case is what percent of the costs expended by Marriott were "necessary" within the meaning of CERCLA.

The NCP is a series of regulations, promulgated by the Environmental Protection Agency ("EPA"), that establish the procedures and standards for government and voluntary response actions to hazardous substances, setting up a process for the evaluation and selection of remedies prior to actual cleanup activities.

The procedures a private party should follow in responding to a release of hazardous substances under CERCLA are set forth in Subpart H of the NCP. 40 C.F.R. § 300.700. Subpart H provides that a private party response action will be considered consistent with the NCP "if the action, when evaluated as a whole, is in substantial compliance with the requirements of 40 C.F.R. § 300.700(c)(5) and (6) and results in a CERCLA-quality cleanup, 40 C.F.R. §§ 300.700(c)(3)(I)." The accompanying comment to Subpart H states that a "CERCLA-quality cleanup" is one that (1) satisfies the three basic remedy selection requirements of CERCLA, i.e., is protective

of human health and the environment, utilizes permanent and alternative treatment methods "to the extent possible," and is cost effective; (2) attains applicable and relevant and appropriate requirements ("ARAR's"); and (3) provides for meaningful public participation. 55 Fed.Reg. 8793.

When evaluated as a whole, Marriott's cleanup was in substantial compliance with the NCP and resulted in a CERCLA quality cleanup. The voluminous assessment and remedial action reports, along with the testimony of Marriott's consultants and experts, establish Marriott performed all the core elements of a CERCLA-quality response action consistent with the NCP: (1) project scoping; (2) a remedial investigation ("RI"); (3) a baseline risk assessment; (4) screening, development and analysis of remedial alternatives (also known as a feasibility study); (5) the equivalent of a record of decision ("ROD"); and (6) implementation of the selected remedy (also known as the remedial design/remedial action phase).

The results from tests performed in Area C, the debris pit, established the existence of wastes with elevated levels of lead and PCBs well in excess of federal, state and local standards. As acknowledged by DERM inspectors, levels of lead in excess of the EPA's 5.0 mg/l TCLP hazardous waste standard for lead mandated removal of the debris material and its disposal at a licensed hazardous waste facility outside of Florida. Levels of PCBs found at the Marriott property were 40 times greater than DERM's 1.0 ppm standard, and six times greater than the 5.9 ppm standard developed for the Marriott site by a risk assessment. The buried debris was a non-homogenous industrial waste mix comprised of ink and mill sludges which contained elevated levels of lead, PCBs, and other contaminants which were intermixed with non-hazardous solid waste such as wood, beer cans, bottles, stained soils, stacks of newspapers, cardboard, and miscellaneous plastics. The non-homogeneity of the material made the

7. Two lines of authorities address individual liability under CERCLA: one holding that the officer or director need only have the authority to control a company's operations, *City of North Miami v. Berger,* 828 F.Supp. 401, 411 (E.D.Va. 1993), the other that an individual must not only have the authority to control a company's operations, but must be shown to have actually exer-

cised that authority by participating in the company's operations, *Levin Metals Corp. v. Parr–Richmond Terminal Co.,* 781 F.Supp. 1454 (N.D.Calif.1991). It is unnecessary to decide which line of cases is controlling in light of the finding that Leon Simkins exercised operational authority at the polluting establishment.

entire debris pit an unacceptable health risk. It would have been impractical, as already found, for Marriott to segregate material which exceeded RCRA standards, TSCA standards, or site specific TCLs from the other intermixed nonhazardous material.

In formulating its cleanup plan, Marriott considered several different remedial options. It documented its assessment and cleanup plan in a series of reports reviewed and approved by DERM. Prior to implementing the chosen remedy of excavation, Marriott twice met with Simkins and its environmental consultants, provided them with copies of the proposed cleanup plan, gave an oral presentation of the proposal, and answered questions from Simkins' consultants concerning its specifications.

Moreover, Marriott's decision to expand its excavation beyond the areas identified in the initial cleanup plan was appropriate, necessary, and consistent with the NCP. The DERM-approved Remedial Action Plan called for Marriott to excavate until "all visible fill material (i.e., pulp sludge, paper products, paint cans, construction debris) is removed." These materials had been identified as the source of the elevated test results. Of particular concern were the materials which exceeded EPA's TCLP standard, which, by definition, had the potential to leach into the underground Biscayne Acquifer which is Dade County's sole source of drinking water. The fact that Marriott's assessment failed to identify all the places where defendants concealed their industrial wastes does not mean that these hazardous substance-laden wastes should have been left in the ground. Rather, as the excavation disclosed that contaminated inks and sludges were more widespread than initially believed, Marriott's decision to continue excavation was reasonable.

Further, the increase in material excavated at the site by more than 50% from the initially estimated quantity did not require an Explanation of Significant Differences ("ESD") under 40 C.F.R. § 300.435. An ESD is intended to provide public notice of a change in remedy. Here, the remedy, excavation of hazardous substance-laden industrial wastes, including sludge and debris, did not change significantly. According to Mike McLaughlin, an attorney, environmental engineer and expert in pollution cleanup, expansion was generally consistent with the NCP so there was no need to reopen the process for public comment. It is not unusual, he said, that the extent of contamination is found to be greater after excavation is started. Further, the statutory requirement for public comment was satisfied with the newspaper advertisement for a public hearing, notice to Simkins Industries of the Remedial Action Plan, and the response and involvement of Dade County. As the site was a rather remote dump in an industrial zone, citizen response was typically absent.

Marriott's response actions at the site, including the decision to expand the excavation to remove industrial wastes and other contaminated materials which posed a threat to public health and the environment, were both reasonable and necessary under CERCLA. The Court concludes that the response costs incurred by Marriott in the amount of $2,962,727.10 are both reasonable and necessary and meet all applicable requirements of CERCLA.

Judgment is hereby entered for Marriott Corporation, against Simkins Industries, Inc. and Leon Simkins, in the amount of $2,962,-727.10, for which amount execution may issue forthwith. The Court reserves jurisdiction to award interest and costs.