**MIAMI–DADE COUNTY,
Florida, Plaintiff,**

v.

**UNITED STATES of America,
Defendant.**

**Civ. No. 01–1930.**

United States District Court,
S.D. Florida,
Miami Division.

Sept. 30, 2004.

Thomas H. Robertson, Dade County Attorney's Office Metro Dade Center, Lori Anne Sochin, Greenberg Traurig, Miami, FL, Reginald L. Bouthillier, Jr., Greenberg, Traurig, Hoffman, Lipoff, Rosen & Quentel, Tallahassee, FL, Ronald W. Kleinman, Peter M. Gillon, Reed D. Rubinstein, Greenberg Traurig, Washington, DC, Robert J. Joyce, Joyce, Paul, Carlson & McDaniel, Tulsa, OK, Mitchell J. Rotbert, Sabrina Mizrachi, Rotbert & Associates, Rockville, MD, for plaintiff.

Guy Alan Lewis, Wilfredo Fernandez, Beth Dawson Jarrett, United States Attorney's Office, Lily Chinn, Lewis M. Barr, Tracy N. Gruis, United States Department of Justice Environment & Natural Resources, Washington, DC, for defendant.

*ORDER SETTING FORTH FINDINGS OF FACT AND CONCLUSIONS OF LAW FOLLOWING NON–JURY TRIAL*

MARTINEZ, District Judge.

This is a civil environmental action brought by Miami–Dade County against the United States of America for monetary recovery, injunctive relief, and declaratory relief arising from environmental contamination at and around Miami International Airport ("MIA"), which is located in Miami–Dade County, Florida. Miami–Dade County seeks relief pursuant to two federal statutes, the Comprehensive Environmental Response Compensation and Liability Act of 1980 ("CERCLA"), as amended 42 U.S.C. §§ 9601–9675, and the Resource Conservation and Recovery Act ("RCRA"), as amended, 42 U.S.C. §§ 6901–6992; certain Florida statutes;

and Chapter 24 of the Miami–Dade County Code. The Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367.

The Court conducted a non-jury trial in this action on sixteen days between December 8, 2003 and January 7, 2004. After reviewing written memoranda of law submitted by the parties, the Court heard closing arguments on February 4, 2004. Having carefully considered the testimony and evidence, the briefs of counsel, and for the reasons set forth below, the Court enters the following Findings of Fact and Conclusions of Law in accordance with its obligations under Rule 52 of the Federal Rules of Civil Procedure.

## I. FINDINGS OF FACT

### A. The Parties

1. Plaintiff, Miami–Dade County (the "County"), is a charter county established pursuant to the Florida Constitution. Article VIII, Section 1(g) of the Florida Constitution provides that charter counties

shall have all powers of local self-government not inconsistent with general law, or with special law approved by vote of the electors. The governing body of a county operating under a charter may enact county ordinances not inconsistent with general law. The charter shall provide which shall prevail in the event of a conflict between county and municipal ordinances.

*See Levy v. Miami–Dade County,* 254 F.Supp.2d 1269, 1272–74 (S.D.Fla.2003) (discussing the historical background of the County, as provided to the Court by stipulation of the parties). The County has acted as landlord for aviation industry tenants at MIA since 1948. (Exs. 6, 7, 5030, 5179, 5196, 5198, 5200, 5221, 6178, and 6482).[1] The County concedes it is a

---

1. Pursuant to the Court's Order, all trial exhibits were labeled using numbers. Plaintiffs'

exhibits are labeled 1–4,999, and Defendant's

responsible party under 42 U.S.C. § 9607(a).

2. Defendant, United States of America (the "United States"), is the federal government established by the Constitution of the United States of America and includes all relevant agencies of the federal government. Absent a waiver of sovereign immunity, this Court lacks jurisdiction to hear a claim against the United States. *FDIC v. Meyer,* 510 U.S. 471, 475, 114 S.Ct. 996, 127 L.Ed.2d 308 (1994); *United States v. Sherwood,* 312 U.S. 584, 586, 61 S.Ct. 767, 85 L.Ed. 1058 (1941). The United States acted as the exclusive owner and operator of MIA from 1942 to 1948. (Ex. 8).

**B. Procedural Background**

3. The County filed suit against the United States on May 11, 2001 and demanded trial by jury. Subsequently, upon Defendant's motion, the Court struck the jury demand as to all counts. (D.E. No. 150). Count I of the Complaint seeks contribution under CERCLA for the direct owner/operator liability of the United States, for the World War II period,[2] the post-World War II transition period,[3] and the post-World War II period.[4]

4. Count II seeks contribution under CERCLA for arranger liability of the United States in connection with its direct operations at MIA.

5. Count III seeks contribution under CERCLA for activities performed for and at the direction of the United States by Aerodex, Inc. ("Aerodex").

6. Count IV seeks contribution under CERCLA for activities performed for and at the direction of the United States by private maintenance companies.

7. Count V seeks contribution under CERCLA for activities of the "overhaul joint venture," a common law joint venture between the United States and Aerodex.

8. Count VI seeks declaratory relief under CERCLA that the United States is liable to the County for the United States' allocable share of the cost incurred and costs to be incurred in response to releases or threatened releases of hazardous substances at or from the facilities at MIA.

9. Count VII is a RCRA citizens' suit by which the County seeks a preliminary and permanent injunction ordering the United States to undertake, perform, and pay for any further responses, investigations, assessments, or corrective actions necessary in connection with the releases of solid wastes, hazardous substances, pollutants, contaminants, and petroleum products caused or contributed to by the United States that may present an imminent and substantial endangerment in or around MIA.

10. Count VIII seeks cost recovery, contribution, and declaratory relief pursu-

---

exhibits are labeled 5,000–9,999. (D.E. No. 157).

**2.** The County describes the World War II period as the time from 1942 through the end of World War II. (Compl.¶ 196). The County alleges during this time the United States owned and operated various facilities at MIA. *Id.*

**3.** The County describes the post-World War II transition period as the time from when the United States ceased military operations at MIA at the end of World War II until the

United States deeded its facilities at MIA to the County in 1948. (Compl.¶ 199). The County alleges during this time the United States owned facilities at MIA, which were leased to various private commercial operations. *Id.* at ¶ 200.

**4.** The County describes the post-World War II period as the time from 1948 until 1961, in which the United States leased portions of MIA from the County. (Compl.¶ 203). The County alleges the United States, as lessee, was the owner and operator of various facilities at MIA.

ant to Section 376.313, Florida Statutes. Section 376.313 allows an individual to bring a cause of action for damages and contribution resulting from pollution discharges.

11. Count IX seeks contribution and declaratory relief pursuant to Section 403.727, Florida Statutes. Section 403.727(8) provides that a party liable for pollution conditions which violate the statute shall have a right to contribution from other parties liable for the pollution conditions, as set forth in § 403.727(c). Section 403.727(c) is modeled 42 U.S.C. § 9607(a)(3), which identifies parties who are potentially liable for the payment or reimbursement of response costs under CERCLA. *See Florida Power & Light Co. v. Allis Chalmers Corp.*, 893 F.2d 1313, 1317 n. 3.

12. Count X seeks cost recovery, declaratory relief, preliminary and permanent injunctive relief, and civil penalties pursuant to Chapter 24 of the Miami–Dade County Code ("County Code"). Specifically, the County alleges the United States' actions resulted in pollution discharges to state waters, a nuisance, and a sanity nuisance in violation of Chapter 24–11(1) and 24–11(3) of the County Code.

13. The United States moved for judgment on the pleadings. (D.E. No. 82). In its motion, the United States argued the Court lacks subject matter jurisdiction to hear Counts VIII, IX, and X, because the United States has not waived sovereign immunity to suit under the state and local laws at issue.

14. The Court held that as a matter of law, "the CERCLA waiver of sovereign immunity applies only to facilities currently owned or operated by a department, agency, or instrumentality of the United States, and that the RCRA waiver does not apply to past government activities." (D.E. No. 177). However, the Court declined to enter judgment on the pleadings as to Counts VIII, IX, and X, because both parties submitted evidence outside the pleadings, which "present[ed] a genuine issue of material fact as to whether the designation of MIA as a [Formerly Used Defense Site] confers control over MIA to the United States which is sufficient to trigger RCRA's waiver of sovereign immunity." *Id.*[5] The Court stated "[t]his evidence further raises the question of what effect the 1948 quitclaim deeds had on the United States's relationship to [MIA]." *Id.*[6]

15. Subsequently, the United States moved for summary judgment on most of the liability claims made by the County pursuant to CERCLA and RCRA.[7] (D.E.

---

**5.** For more information on the designation of MIAD as a Formerly Used Defense Site, see ¶ 49, *infra*.

**6.** In 1948, portions of Miami Army Airfield, including the Miami Air Deport ("MIAD"), were transferred from the United States to the County pursuant to the Surplus Act of 1944. (D.E. No. 155, at 11). The United States transferred title to the County for the remaining portions of Miami Army Airfield in its possession, including MIAD, through a series of three deeds: a February 5, 1948 "Quitclaim Deed and Surrender of Lease;" a March 17, 1948 "Supplemental Quitclaim Deed;" and an April 14, 1948 "Supplemental Quitclaim Deed." *Id. See also* Exs. 6, 7, and 5030. For purposes of this Order, these deeds collectively will be referred to as "the 1948 quitclaim deeds."

**7.** Specifically, the United States moved for summary judgment on Count I to the extent that it alleges the United States released chlorinated solvent hazardous substances during 1948 to 1961, which is the time period the U.S. Air Force leased portions of MIA from the County. Second, the United States moved for summary judgment as to Counts II, III, and IV to the extent they allege: arrangements for disposal of chlorinated solvent hazardous substances during and after World War II; federal operation of certain companies during and shortly after World War II; and federal operation of Aerodex and other

No. 109). The Court held summary judgment was inappropriate, because there were genuine issues of material fact. (D.E. No. 179). The Court further held to the extent the parties agreed upon issues of material facts, they drew divergent inferences and conclusions from those facts, in light of the disputed issues of material fact. *Id.*

16. The County also moved for partial summary judgment that the United States is a former owner of a facility for purposes of CERCLA liability pursuant to 42 U.S.C. § 9607(a)(2). (D.E. No. 127). Specifically, the County sought to establish the United States is a former owner of: U.S. Air Force aircraft; a "wash rack" at the U.S. Air Force Landing Apron No. 7; and the Miami Air Depot ("MIAD").[8]

17. In its Response to the County's motion for partial summary judgment, the United States conceded:

> [The United States] was a "former owner" for CERCLA purposes with respect to portions of Miami International Airport ("MIA") that it owned from 1943 to 1948 and with respect to approximately 144 acres of MIA that the United States leased for Air Force use from 1948 to 1966.

(D.E. No. 130).[9]

18. Accordingly, the Court granted the County's motion to the extent the United States conceded it is a former owner of portions of MIA and held the inquiry at trial would be the County's demand for equitable allocation of cleanup costs pursuant to § 113(f)(1) of CERCLA. However,

the Court also held under Florida law the United States is not a former owner of MIAD by virtue of various provisions in the 1948 quitclaim deeds that conveyed title for MIA from the United States to the County and denied the County's motion as to this claim. (D.E. No. 178).

## C. History of MIA Through World War II

19. What is presently known as MIA began its evolution in September 1928 when Pan American Air Ferries, Inc. ("Pan Am") created Pan American Field and started its operations there. Eastern Airlines followed when it established operations in 1934, as did National Airlines, which began operations in 1937. This area also became known as the 36th Street Airport (or the 36th Street Municipal Airport).

20. On September 1, 1939, World War II began with Germany's invasion of Poland. From 1942 to 1946, the United States acquired approximately 2,700 acres of property in Miami, Florida for the creation of a military installation. (D.E. No. 155 at 10). These 2,700 acres were divided into three main areas known as Pan American Field, Miami Army Airfield (20th Street Airport), and MIAD. *Id.*

21. In 1942, Pan Am sold part of the 36th Street Airport to the United States with a provision for Pan Am's later repurchase. *Id. See also* Exs. 6174 and 6482. The Government authorized Pan Am's construction of additional facilities there in 1942 to be used for Pan Am's performance

---

companies in the 1950s through 1970s. Third, the United States moved for summary judgment in its entirety on Counts V and VI. Last, the United States moved for judgment as a matter of law regarding the necessity of the County's past response actions within the westside of MIA and the County's proposed future response actions within the westside of MIA.

**8.** The County did not move for summary judgment as to the amount of United States' alleged liability.

**9.** Pursuant to Order of the Court, the United States later provided a statement of clarification regarding this concession. (D.E. No. 180).

of War Department contracts for air transportation ferrying services of aircraft, engines, equipment, mail, and personnel from Miami to Africa, the Middle East, the Caribbean, and South America in 1942 through 1945. *Id. See also* Ex. 6176. The War Department owned and provided the aircraft, along with the fuel, oil, and spare parts to operate them. (D.E. No. 155, at 10). *See also* Ex. 6177. At the end of World War II, the U.S. Army transferred Pan American Field back to Pan Am. *Id.*

22. On January 5, 1943, the United States authorized construction of a maintenance and overhaul facility on the west side of MIA. Construction of MIAD began on February 16, 1943 and was completed fifteen months later on May 30, 1944. This area became known as MIAD and consisted of approximately 277 acres of real property to which the United States owned title and a portion north of Tenth Street (later Twenty–Fifth Street) that the United States leased from Florida East Coast Railway ("FEC"). In September 1948, the United States gave notice of its intent to quit the premises at the FEC leasehold. (Ex. 376).

23. After the Dade County Port Authority ("the Port Authority") was created in September 1945, the Port Authority became the owner and operator of various parcels that now make up most of MIA. (Ex. 5196 at DCAD0200013–16; Ex. 5198 at DCAD200458; and Ex. 6482). In 1945 and 1946, the Port Authority assumed ownership, operation, and maintenance of the adjacent 36th Street Airport and entered into lease agreements with five airlines. (Ex. 5196 at DCAD200013). In 1945, the Port Authority also purchased Pan American Field from Pan Am and purchased the Consolidated Vultee ("Convair") Plant that was located on another side adjacent to the Pan American Field from the federal government. (Ex. 5179; Ex. 5196 at DCAD2000014; Ex. 5198; Ex.

5200; Ex. 5221; Ex. 6178; and Ex. 6482). In 1948, the Port Authority obtained title to MIAD and nearby lands and improvements in a series of three deeds by the federal War Assets Administration. (D.E. No. 155, at 11). *See also* Exs. 6, 7, and 5030. A map of the entire airport and surrounding area shows that the MIAD/West Cargo Area was located in what is today the southwest quadrant of MIA. (Ex. 6483).

## D. History of Airport Areas Leased and Occupied by the U.S. Air Force from 1948 to 1961

24. On April 15, 1948, the United States leased back from the County approximately 144 acres of MIAD for its exclusive use for a total rent of one dollar per year for a term of twenty years. (D.E. No. 155, at 11). *See also* Exs. 5 and 5414. The United States used these parcels, and the buildings and equipment thereon, for U.S. Air Force Reserve activities, including the maintenance of U.S. aircraft. (Exs. 5, 5119, 5130, and 5754).

25. At various time in the late 1940s through 1961, the U.S. Air Force personnel stationed in the leased areas included officers, airmen, and civilians associated with the 473rd Army Air Corps Base (later redesignated as the 2585th Air Reserve Flying Center and Reserve Training Center), the 2586th Air Reserve Flying Center, the 435th Troop Carrier Wing, the 906th Reserve Training Wing, and the Civil Air Patrol. (D.E. No. 155, at 11). Other reserve units located at this facility at various times during this period included the 456th Troop Carrier Wing, 76th Troop Carrier Squadron, the 77th Troop Carrier Squadron, the 8511th Navigation Training Squadron, the 301st Air Rescue Squadron, and Detachment 6 of the 13th AACS Squadron. *Id.*

## E. Aerodex Facilities and Operations

26. In total, during the period of the 1950s to the present, more than 100 private industrial and commercial tenants at MIA operated facilities that used, or are likely to have used, and released chlorinated solvents for cleaning and degreasing metal parts and surfaces, by vapor degreasing, spraying, dipping, or wiping. A diagram of MIA shows the buildings occupied by County tenants who are known to have used, or who likely used, chlorinated solvents through 1996. (Ex. 6485). *See also* Ex. 6479A. Although the Complaint alleges several maintenance companies performed work for the United States at MIA facilities, such as Aerodex, Air International, American Airmotive, Butler Aviation, Eastern, Pan Am, and Pan Am Ferries, the evidence shows the most significant of these is Aerodex, a private company engaged in the repair and overhaul of aircraft engines and parts. (Compl.¶¶ 118–164).

27. From the early 1950s to the mid–1970s, Aerodex leased buildings and facilities from the County. All known leases between the Port Authority and Aerodex were signed by Aerodex executives. The United States, including the U.S. Air Force, was not a party to any of these leases or amendments thereto.

28. Aerodex's work at MIAD involved the production line disassembly, cleaning, inspection, overhaul, parts rework, refurbishment or replacement, and reassembly of aircraft engines, using conveyor belt or chain hoist systems. (D.E. No. 155, at 12). *See also* Exs. 5665 and 6431. After reassembly, Aerodex conducted lengthy engine operation testing prior to repackaging and shipping the engines back to the customer. Aircraft engines are complex machines that must obviously be ultra-reliable for the safety of those in the aircraft and those on the ground. (Exs.6566–6569).

29. The Aerodex contracts with the U.S. Air Force related to the overhaul of a number of different models of reciprocating aircraft engines and jet aircraft engines from the 1950s through 1971. (D.E. No. 155, at 13). Most of Aerodex's contracts with the U.S. Air Force were fixed-price contracts. Dep. of Marvin Spallina.[10] The combined value of these contracts totaled millions of dollars during that period. Although the parties believe there are many contracts, the parties have found extant copies of just portions of four contracts between Aerodex and the U.S. Air Force ("the four partial contracts").[11]

30. The terms of Aerodex's contracts with the U.S. Air Force were governed by military procurement laws and regulations during that period. *See, e.g.,* Exs. 5358 and 5362. These regulations dictated the contract bidding process and the scope of contracts with the U.S. Air Force. Specifically, these regulations contained requirements for "solicitation of bids" and "awards of contract" and a series of "uniform contract clauses and standard contract forms" to be used, including provisions relating to "Changes," "Inspection," "Payments," "Disputes" and "Termination for Convenience of the Government." (Ex. 5358 at MA00003DAR, MA00018DAR–30DAR). *See also* Ex. 5362 at MA000442–452DAR. Generally, the regulations required competitive bid contracts be award-

---

10. The Court accepts the Corrected Notice of Deposition Designations for Marvin Spallina (D.E. No. 221), which shall be included in the trial record.

11. The four partial contracts include: an October 1959 Contract No. AF41(608) 11285 for overhaul of R–4360 engines (Ex. 17); a January 1968 Contract No. F41608–68–C–0690 for work on J–57 engines (Ex. 5501); a September 1968 Contract No. F41608–69–D–0245 for overhaul of R–4360 engines (Ex. 5502); and an October 1968 Contract No. F34601–69–C–0098 for overhaul of T–56 engines (Ex. 22A).

ed to the lowest qualified bidder. (Ex. 5358 at MA00014DAR; Ex. 5362 at MA000416DAR; and Test. of Tommy B. Jordan).

31. In general, three kinds of U.S. Air Force personnel interacted with private contractors, such as Aerodex: contracting officers (such as Mr. Jordan); quality inspection personnel (such as Mr. Earl Coffey); and government property accountants. Government procurement regulations defined "contracting officer" as the military officer or civilian employee "with the authority to enter into and administer contracts and make determinations and findings with respect thereto." (Ex. 5358 at MA00012DAR, MA00017DAR). The contracting officer was charged with obtaining the most advantageous contract for the Government, "price, quality and other factors considered." *Id.* at MA00014DAR.

32. The U.S. Air Force contracts Aerodex was awarded were the result of competitive bidding. Dep. of Earl Coffey; Dep. of Marvin Spallina; and Dep. of Jean Marcotte. The Aerodex contracts referred to specifications documents, which contained the details such as the dimensions of engine parts, power output of overhauled engines, and other technical matters. *Id.*

33. The evidence fails to establish any of the available U.S. Air Force Technical Order Manuals were incorporated by reference into Aerodex contracts with the U.S. Air Force, such that the provisions of those manuals are part of the Aerodex contracts. None of the technical order manuals presented in evidence are cited in the four partial contracts. (Exs. 17, 22A, 5501, and 5502). In fact, none of the four partial contracts contain citations to any technical order manuals.

34. None of the four partial contracts presented at trial contain provisions relating to Aerodex waste disposal, and there are no such provisions in the standard contract clauses found in the Armed Services Procurement Regulations of the period. (Exs. 17, 22A, 5358, 5362, 5501, and 5502). The evidence shows, in federal procurement, it was generally understood such matters were the responsibility of the contractor. *See* Ex. 5422 and Dep. of Earl Coffey.

35. During World War II, the supplies, uses, and distribution of trichloroethene, also known as trichloroethylene [hereinafter referred to as "TCE"], were controlled by federal agencies as part of the industrial mobilization for the war. (Exs. 5391, 5394–5396, 5407, and 5436–5438; and Test. of John B. Robertson). Such controls included conservation, recycling, the use of substitutes, and the allocation of available supplies to priority users. *Id.* During the 1950s through 1970s, TCE was a widely-used industrial degreasing solvent. Aerodex, other MIA aircraft engine overhaul companies, and major airline MIA overhaul facilities used significant amounts of TCE in their operations. *See, e.g.,* Ex. 5288; Ex. 5290; Ex. 5326 at DERMS14808–0192; Ex. 5334; Ex. 5337 at DERMS14808–0243, 0300–0374; Ex. 6100; and Ex. 6318.

36. Aerodex management personnel in the 1950s included: C.B. Edmonds, Jr., and Henry C. Huntress, Jr. (Aerodex Plant Managers), Raymond M. Tonks (Executive Vice President and General Manager), Nicholas Silverio (Contract Administrator), Clarence Ostoff (Supervisor of Planning and Purchasing), and Dayton E. Smith (Chief Accountant). (D.E. No. 155 at 12). By 1956 or 1957, Raymond Tonks was Aerodex's President and General Manager and remained in those positions until the dissolution of Aerodex in bankruptcy in the mid–1970s. *Id.*

37. In the 1950s through early 1970s, other Aerodex personnel included Carl

Larson (Aerodex Plant Manager), Thomas Carey (Aerodex Plant Engineer), William C. Hunt, V.J. Knezevich (Aerodex Plant Engineer), and Ralph Baynes (Aerodex Plant Engineer). *Id.* From the 1950s through early 1960s, Neil D. MacMillan was the Aerodex Comptroller. *Id.* As of 1968, Aerodex had hired a "Pollution Control Engineer," Rolando R.H. Santos, who held this position through 1975. *Id.* The day-to-day direction and management of the engine overhaul work was the responsibility of lower level Aerodex managers and supervisors.

38. In the late 1960s through 1970s, senior Aerodex executives also included: Henry C. Huntress, Jr. (Aerodex Vice President of Plant Operations), Clarence O. Osthoff (Aerodex Vice President and Assistant Treasurer), Nicholas Silverio (Aerodex Vice President of Contract Administration and Quality Control), Stanley H. Apte (Aerodex Contracts Manager), and Dayton E. Smith (Treasurer and Corporate Secretary). (D.E. No. 155 at 12).

39. None of the aforementioned Aerodex executives were employees of the federal government.

40. Aerodex worked on both military and commercial engines throughout its history. In the 1950s through 1960s, the amount of commercial, non-military work was twenty percent or less. (Ex. 5514 at AA0647209). The procedures for performing work on commercial engines was essentially the same as the procedures utilized for the work done on military engines. (Exs. 386–388; Test. of Roger Currier, Test. of Jean Marcotte; Test. of Gary Nichols; and Dep. of Earl Coffey). By 1969, the amount of military work was declining steadily, and Aerodex focused its emphasis on commercial work. (Ex. 5515 at AA0647250). By 1972, Aerodex was performing only commercial work. (Ex. 5656 at AA0647135; and Ex. 5518 at AA0647332).

41. Aerodex was discharged in bankruptcy and liquidated in 1976. (Ex. 5896).

## F. Contamination and Cleanup Efforts at MIA

42. The primary contaminant of concern in the soils and groundwater at MIA and in the Lower Miami Springs Wellfield ("LMSWF") is vinyl chloride, a degradation product from TCE and other volatile organic compounds ("VOCs").

43. After several years of investigation, the United States Environmental Protection Agency ("EPA") issued its September 1985 Record of Decision for the Biscayne Aquifer Sites ("the Biscayne Aquifer ROD"). (D.E. No. 155, at 14). *See also* Ex. 5276. Under CERCLA, a record of decision documents the selection of the response actions for a particular site, the reasons for that selection, and the process, including public participation, that led to the record of decision. The study area for the Biscayne Aquifer ROD covered eighty square miles, and included the Miami Drum site, the NW 58th Street Landfill, and the Miami International Airport Varsol site. These sites were "collectively designated as the Biscayne Aquifer Site to address the threat to the regional water supply." (Ex. 5276 at CTY00379–0032). The Biscayne Aquifer ROD concluded:

> The results of these investigations indicate that, at this time, there is no concentrated contaminant plume emanating from any of the three sites in the study area. However, low, dispersed levels of volatile organic chemicals have been found throughout the study area and plumes have blended together and become indistinguishable with the general poor ground-water quality in the developed area. The main explanation for this is found in the geohydrologic conditions within the study area: the high transmissivity of the Biscayne aquifer;

the widespread interaction of ground water with surface-water bodies throughout the study area; and the high, continuous pumping of ground water at the several municipal well fields. *Id.* at CTY00379–0013 to 0014.

44. The Biscayne Aquifer ROD emphasized the presence of significant levels of total VOCs, including vinyl chloride, in the area groundwater. Other—intermediate—chlorinated solvent degradation products from TCE identified included trans–1,2–dichloroethylene and 1,1–dichloroethylene. *Id.* at CTY00379–0015–CTY00379–0029; and Ex. 6513. The EPA also noted some detections of TCE itself—below established criteria—in the monitoring wells along NW 36th Street and at the NW 58th Street Landfill. (Ex. 5276 at CTY00379–0006, 0012).

45. The Biscayne Aquifer ROD stated the prior EPA Remedial Investigation found that "continuous pumping of the Miami Springs and Preston production wells tends to draw contaminants from within and around the cone of influence of the well field area." *Id.* at CTY00379–0035. The Biscayne Aquifer ROD also stated:

> Historically, the cone of depression resulting from the withdrawal of approximately 150 million gallons per day (mgd) of water from the Miami Springs and Preston Well Fields encompassed the northern half of the Airport, all of the Miami Drum Site and extended as far west as one-half mile east of the 58th Street Landfill.

*Id.* at CTY00379–0008. The EPA further stated "there are numerous other unidentified smaller sources (small businesses and individuals) scattered throughout the study area that are known to be contributing to ground-water contamination. However, no distinguishable plume could be identified from any of these sources." *Id.* at CTY00379–0035.

46. Thus, the Biscayne Aquifer ROD rejected the idea of treating ground water at each of the various sources of contamination in the study area as "impractical." (Ex. 5276 at CTY00379–0035). Instead, the EPA concluded it was "more reliable and practical" to withdraw and treat the water at the well fields. *Id.* The Biscayne Aquifer ROD stated "[t]he remedy selected is to add air-stripping to the existing water treatment system in the study area and to operate the Miami Springs and Preston municipal wells for the dual purpose of providing potable water and recovering contaminated water from the Aquifer." *Id.* at CTY00379–0001; and Ex. 6514. As the EPA explained:

> The remedy provided for ... was found to be superior to the other alternatives investigated in the detailed evaluation. Only [this] Alternative ... will fulfill both goals of the study by providing uncontaminated drinking water to the public as well as providing significant cleanup of the aquifer. Also, [this] Alternative ... has the lowest present worth cost of the feasible remedies ... (excluding the no-action alternative).

(Ex. 5276 at CTY00379–0045).

47. Air stripping is:

> [A] physical process which exposes a large surface area of the raw water to a much larger volume of [injected] turbulent process air. [This] allows the outgassing of the VOC compounds from the water into the process air, which is exhausted into the atmosphere. The organic compounds which are released to the process air are present in very low concentrations, and are easily dispersed into the ambient atmosphere and are readily destroyed by the photochemical action of sunlight.

(Ex. 5929 at MA000989EPA–990EPA).

48. By late 1992, sixty-four air stripping tower systems had been built and

were operating at the County's Hialeah and Preston Water Treatment Plants to treat water from the LMSWF and other County well fields. These systems have remained in operation to the present day. Of the sixty-four air-stripping tower systems installed pursuant to the Biscayne Aquifer ROD, only twenty handle water pumped from the wells of the LMSWF. (Test. of Alan Thomas Segars; Test. of Michael Minett; and Ex. 5930). The remaining forty-four air-stripping tower systems treat water pumped from other municipal well fields. *Id.*

49. In November 1990, the U.S. Army Corps of Engineers' designated MIAD as a Formerly Used Defense Site ("FUDS") eligible for clean up under the Defense Environmental Restoration Program— Formerly Used Defense Sites ("DERP"). (Exs. 5374 and 5377). The DERP–FUDS program imposes cleanup responsibility on the United States for each site "owned by, leased to, or otherwise possessed" by the United States and under the jurisdiction of the Secretary of Defense and each site "which was under the jurisdiction of the Secretary and owned by, leased to, or otherwise possessed by the United States at the time of actions leading to contamination of hazardous substances." 10 U.S.C. § 2701(c)(1)(A) and (B). However, the designation of a site as eligible under the DERP–FUDS program "does not constitute an admission of [Department of Defense] cleanup liability for that site." (Ex. 5386 at ¶ 4.a).

50. In June 1993, the EPA issued the Superfund Final Close Out Report for the Biscayne Aquifer Site (hereinafter "the 1993 Close Out Report"). (D.E. No. 155, at 14). The 1993 Close Out Report stated the remedial action taken occurred, be-

cause "volatile organic compounds (VOCs), including vinyl chloride, ... had been detected in municipal water supply wells" and "some of the contamination may have been contributed by three hazardous waste sites," including part of MIA, identified in the Biscayne Aquifer ROD. (Ex. 5304 at MA000892EPA). The 1993 Close Out Report documented that the EPA and the Florida Department of Environmental Regulation ("FDER")[12] had determined the remedial actions selected in the Biscayne Aquifer ROD were "operational and functional. The only remaining activities for this action involve the long term Operation and Maintenance (O & M) of the system." *Id.* Representatives of EPA, FDER, Miami–Dade Water and Sewer Authority Department ("WASAD"), and the U.S. Army Corps of Engineers inspected the system on October 29, 1992. *Id.* WASAD confirmed in a December 1992 letter that construction was complete and submitted the Remedial Action Report to the EPA in May 1993. *Id.* Confirmatory sampling showed the Biscayne Aquifer ROD treatment standards for VOCs in drinking water were being met. *Id.* at MA000900EPA.

51. In the 1993 Close Out Report the EPA stated that in addition to the treatment systems remedy selected in the Biscayne Aquifer ROD, local government institutional controls by law prohibited private water wells from being drilled in the area and thereby prevented human exposure to contaminated water:

Dade County Code 24–25 regulates construction and operation of wells in the study area (applicable to all of Dade County). Construction and/or operation of a new or existing well requires a

12. In 1993, the Florida legislature merged the Florida Department of Environmental Regulation ("FDER") with the Department of Natural Resources to form the Florida Depart-

ment of Environmental Protection ("FDEP"). For purposes of this Order, FDER and FDEP will be used interchangeably, because further distinction is not dispositive.

permit from the Dade County Department of Environmental Resources Management (DERM). Thus, through existing institutional controls, Dade County can control the installation of wells in the County.

(Ex. 5304 at MA000896EPA).

52. Therefore the EPA concluded, and the State of Florida concurred, that with institutional controls "no further Superfund action is necessary to protect human health and the environment." *Id.* at MA00892EPA.

53. On August 27, 1993, the Metropolitan Dade County Department of Environmental Resources Management ("DERM") and the Metropolitan Dade County Aviation Department ("DCAD") entered into a Consent Agreement (hereinafter "the 1993 Consent Agreement") regarding environmental matters at MIA. (Ex. 3).

54. On May 28, 1998, the Florida Department of Environmental Protection ("FDEP") and DCAD entered into a Consent Order and Settlement Agreement ("the 1998 Consent Order") regarding environmental matters at MIA. *Id.*

55. Any of the foregoing factual findings which may represent conclusions of law are adopted as conclusions of law. *See Miller v. Fenton,* 474 U.S. 104, 114–15, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985).

## II. CONCLUSIONS OF LAW

### A. The County's Burden of Proof on its CERCLA Claims

■ 1. Liability under CERCLA requires that a plaintiff prove four basic elements: (1) there has been a "release" or "threatened release" of "hazardous substances" from a site; (2) the site is a "facility," (3) the release or threatened release has caused incurrence of "response costs;" and (4) the defendant is one of the kinds of persons who are responsible for the incurrence of those costs. 42 U.S.C. § 9607(a); *Blasland, Bouck & Lee, Inc. v. City of N. Miami,* 283 F.3d 1286, 1302 (11th Cir.2002).

2. Section 107(a) of CERCLA specifically identifies four categories of responsible parties who are potentially liable for the payment or reimbursement of response costs: (1) current owners and operators of a facility at which there is a release or threatened release of a hazardous substance; (2) persons who owned or operated the facility at the time of a hazardous substance disposal; (3) persons who arranged for disposal or treatment of a hazardous substance at the facility; and (4) persons who selected the facility and transported hazardous substances to it. 42 U.S.C. § 9607(a)(1)-(4).[13] The County concedes it is a responsible party under Section 107(a).

3. There is no dispute the MIA buildings, equipment, and waste disposal locations relevant in this case are CERCLA "facilities" (42 U.S.C. § 9601(9)) at which "releases" (42 U.S.C. § 9601(22)) of "hazardous substances" (42 U.S.C. § 9601(14)) have occurred.[14] Therefore, the County has established the first three elements of a *prima facie* case, and the remaining issue is whether the County has established the United States is one of the kinds of persons who are responsible for the incurrence of those costs. *See* 42 U.S.C. § 9607(a); *Blasland, Bouck & Lee, Inc. v. City of N. Miami,* 283 F.3d at 1302.

---

**13.** CERCLA contains a definitional provision for many of its terms used throughout CERCLA, including "facility," "hazardous substance," "owner or operator," "person," "release," "transport," and "disposal." *See* 42 U.S.C. § 9601.

**14.** The chemicals, wastes, and related substances that are "hazardous substances" are listed at 40 C.F.R. § 302.4.

4. Because the County concedes it is a responsible party under § 107(a), the County is a contribution plaintiff under § 113(f)(1). *See* 42 U.S.C. § 9613; and *Redwing Carriers, Inc. v. Saraland Apts.,* 94 F.3d 1489, 1496 (11th Cir.1996). Under CERCLA, where one responsible party, such as the County, seeks to impose the response cost burden on other potentially responsible parties, it is inherently and solely an action in contribution. One potentially responsible party therefore may not obtain a judgment of joint and several liability against another potentially responsible party. *Id.*

5. If the County establishes the United States is liable under CERCLA, then the County also bears the burden of proof in affirmatively showing its MIAD, North West Cargo Area ("NWCA"), and LMWSF past costs and its alleged estimated future costs are recoverable "response" costs within the meaning of CERCLA. 42 U.S.C. § 9601(25); *Ascon Properties, Inc. v. Mobil Oil Co.,* 866 F.2d 1149, 1152–53 (9th Cir.1989).

6. Under CERCLA, a private party, including a "political subdivision of a state," may recover only what it proves are *"necessary* costs of response … *consistent* with the national contingency plan." 42 U.S.C. § 9607(a)(4)(B) (emphasis added). *See County Line Inv. Co. v. Tinney,* 933 F.2d 1508, 1512 (10th Cir.1991). By contrast, the federal government or a "State," as defined in CERCLA, is entitled to recover *"all* costs of [a response] action … *not inconsistent* with the [NCP]." 42 U.S.C. § 9607(a)(4)(A) (emphasis added).

7. CERCLA limits "State" to "include the several States of the United States, the District of Columbia, the Commonwealth of Puerto Rico, Guam, American Samoa, the United States Virgin Islands, the Commonwealth of the Northern Marianas, and any other territory or possession over which the United States has jurisdiction."

This definition of "State" does not include a "political subdivision of a state." 42 U.S.C. § 9601(27). However, the CERCLA definition of "person" does include a "political subdivision of a state." 42 U.S.C. § 9601(21). Congress' exclusion of a "political subdivision of a state" from the definition of a "State" can only be regarded, therefore, as deliberate.

8. The difference in statutory language means that in cost recovery claims by the United States or a State, the defendant bears the burden of proving the costs of a response action were inconsistent with the national contingency plan ("NCP"). *See, e.g., United States v. Findett Corp.,* 220 F.3d 842, 849 (8th Cir. 2000); *United States v. Burlington N. R.R. Co.,* 200 F.3d 679, 695 (10th Cir.1999); *United States v. Chapman,* 146 F.3d 1166, 1170–71 (9th Cir.1998). Here, however, the County bears the burden of proving its actions are necessary and consistent with the NCP. By the clear language of CERCLA, the County, as a "political subdivision of a state," is not entitled to the presumption that response actions taken were necessary and consistent with the NCP, to which States and the Federal government are entitled. *See, e.g., Tinney,* 933 F.2d at 1512; *Town of New Windsor v. Tesa Tuck, Inc.,* 919 F.Supp. 662, 681–84 (S.D.N.Y. 1996); *Sherwin–Williams Co. v. City of Hamtramck,* 840 F.Supp. 470, 474–75 (E.D.Mich.1993); *City of Philadelphia v. Stepan Chem. Co.,* 713 F.Supp. 1484, 1487–89 (E.D.Pa.1989). Thus, the County must prove as part of its *prima facie* case the costs incurred were consistent with the NCP. *Id.* The County's status as a charter county does not alter this burden.

9. To show response costs are "necessary" under CERCLA, the County must show "(1) that the costs were incurred *in response* to a threat to human health or the environment" that existed

prior to the initiation of the response action "and (2) that the costs were necessary to address that threat." *G.J. Leasing Co. v. Union Electric Co.*, 854 F.Supp. 539, 562 (S.D.Ill.1994), *aff'd,* 54 F.3d 379 (7th Cir. 1995). The CERCLA "limitation to 'necessary' costs of cleaning up is important. Without it there would be no check on the temptation to improve one's property and charge the expense of improvement to someone else.... The limitation to 'necessary' response costs would deter them from carrying out this scheme." *G.J. Leasing,* 54 F.3d at 386.

10. Without proof of such a threat to human health or the environment, cleanup action costs are unrecoverable. *Licciardi v. Murphy Oil USA, Inc.,* 111 F.3d 396, 398–399 (5th Cir.1997); *Matter of Bell Petroleum Servs., Inc.,* 3 F.3d 889, 905; *Southfund Partners, III v. Sears, Roebuck & Co.,* 57 F.Supp.2d 1369, 1378–80 (N.D.Ga.1999); *Marriott Corp. v. Simkins Indus., Inc.,* 929 F.Supp. 396, 403–404 (S.D.Fla.1996); *Foster v. United States,* 922 F.Supp. 642, 652 (D.D.C.1996); *Yellow Freight Sys., Inc. v. ACF Indus., Inc.,* 909 F.Supp. 1290, 1299 (E.D.Mo.1995); *Artesian Water Co. v. Government of New Castle County,* 659 F.Supp. 1269, 1278 (D.Del.1987).

### B. The County Failed to Establish it is Entitled to Equitable Contribution from the United States as a Past Owner of Facilities at MIA

11. Under CERCLA, a past "owner" of a facility at the time of disposal of hazardous substance is potentially liable pursuant to 42 U.S.C. § 9607(a)(2).

12. The County argues the United States is liable under CERCLA as a past owner in three ways. First, the County argues the United States is liable for ownership and operation of the Pan Am Ferries Area, 36th Street Area, 20th Street Area, Convair Area, and MIAD Area of MIAD for the World War II period. (Compl. ¶¶ 194–198, 208–213 and Ex. A).[15] Second, the County argues the United States is liable for ownership of the Pan Am Ferries Area, 36th Street Area, Convair Area, and MIAD Area of MIA during the post-World War II transition period. (Compl. ¶¶ 194, 199–202, 208–213 and Ex. A). Third, the County argues the United States is liable for ownership of various portions of the MIAD Area (now known as the West Cargo Area) during the post-World War II period. (Compl. ¶¶ 203–207, 208–213 and Ex. A).

13. Prior to trial, the Court held that under Florida law the United States is not liable as a former owner of MIA based upon various provisions in the 1948 quitclaim deeds. (D.E. No. 178). In other words, the 1948 quitclaim deeds provide no basis for federal ownership liability after 1948, or during the post-World War II transition period, as alleged in Count I. Therefore, to the extent Count I alleges the United States is liable for ownership during the post-World War II transition period, the Court shall enter judgment in favor of the United States.[16]

---

15. For reference purposes, the parties have divided MIA into several subareas. At times, the parties use slightly different terms to identify subareas. *See, e.g.,* D.E. No. 109, at 13 n.5. Overall, the differences are not material. Accordingly, for purposes of this Order the Court will identify the subareas as they have been described in the Findings of Fact or, as appropriate, the cited exhibit or pleading.

16. To the extent the County's allegations of ownership during the post-World War II transition period do not relate to the 1948 quitclaim deeds, the Court finds this time period is indistinguishable from time covered by the alleged World War II period and post-World War II period. Accordingly, the Court's holdings regarding the World War II period and post-World War II period shall apply to the alleged post-World War II transition period.

14. In response to the County's motion for partial summary judgment, the United States conceded:

> [I]t was a "former owner" for CERCLA purposes with respect to portions of Miami International Airport ("MIA") that it owned from 1943 to 1948 and with respect to approximately 144 acres of MIA that the United States leased for Air Force use from 1948 to 1966.

(D.E. No. 130). *See also* D.E. No. 180. Therefore, the Court held the United States was liable under CERCLA as a past owner to the extent it conceded it is a former owner of portions of MIA, and the inquiry at trial would be the County's demand for equitable allocation of cleanup costs pursuant to § 113(f)(1) of CERCLA. *See* 42 U.S.C. § 9613; and *Redwing Carriers, Inc. v. Saraland Apts.*, 94 F.3d at 1496.

15. Section 113(f)(1) states: "In resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate." 42 U.S.C. § 9613(f)(1). Thus, Congress intended for courts to determine what factors should be considered in individual cases, rather than requiring courts to consider any particular factors. *See United States v. R.W. Meyer, Inc.*, 932 F.2d 568, 571–72 (6th Cir.1991) (stating that "by using the term 'equitable factors,' Congress intended to invoke the tradition of equity under which the court must construct a flexible decree balancing all the equities in the light of the totality of the circumstances"). Under § 113(f)(1), a "fair apportionment of the expense" of cleanup is the fundamental objective. *Smith Land & Improvement Corp. v. Celotex Corp.*, 851 F.2d 86, 90 (3d Cir.1988). Accordingly, in any given case, "a court may consider several factors, a few factors, or only one determining factor ... depending on the totality of the circumstances presented to the court." *Environmental Transp. Systems, Inc. v. ENSCO, Inc.*, 969 F.2d 503, 509 (7th Cir.1992). *See also Bedford Affiliates v. Sills*, 156 F.3d 416, 429 (2d Cir. 1998) (holding the allocation of response costs is an equitable determination based on the court's discretionary selection of equitable factors appropriate to the case).

16. When there are "orphans," or persons with relationships to a site but who no longer exist, are insolvent, or who cannot be found (such as Aerodex), the equitable share percentages determined for the viable parties are often used to allocate the orphan share among them. In other words, to the extent the Court determines there are orphan shares, or those shares attributable to defunct, bankrupt or unidentified persons, or persons otherwise unable to pay, the Court may apportion such orphan shares among the solvent parties according to the solvent parties' relative equitable shares previously derived. *See United States v. Kramer*, 953 F.Supp. 592, 597–98 (D.N.J.1997); *Charter Township of Oshtemo v. American Cyanamid Co.*, 898 F.Supp. 506, 508 (W.D.Mich.1995).

17. The Court will consider the United States' concession in two parts: first, federal ownership from 1943 to 1948, which equates to the County's allegations of ownership during the World War II period; and second, the U.S. Air Force lease from 1948 to 1966, which equates to the County's allegations of ownership during the post-World War II period.

18. Regarding the United States' ownership during the World War II period, the evidence established that at MIAD aircraft engine overhaul activities by Army Air Forces[17] personnel began in June

---

17. The Army Air Forces existed until Congress established the United States Air Force in 1947. For purposes of Order, the terms Army Air Forces and U.S. Air Force will be used interchangeably, as further distinction is not dispositive.

1944, and the last engine overhaul at MIAD was completed on August 8, 1945. By the time the facility closed, MIAD had overhauled a total of 4,811 engines. (Ex. 5408 at MA000266WPB; Ex. 5406 at MAX006948; and Ex. 5179 at DCAD203676). *See also* D.E. No. 180 at Ex. 6450.

19. During World War II, what became Building 2005 was a military paint and chemical warehouse. (Compl. ¶¶ 91–95; Exs. 5440).[18] The evidence does not establish any engine overhaul operations occurred in Building 2005 during the period it was owned by the United States. Buildings 2001 and 2002 were also warehouses, and Building 2003 was an administration building. Building T–129 (later "2129") was identified as "Misc. & Sig. O. Repair." (Exs.6451–6457). Buildings 2000 and 2004 did not exist in MIAD at the time, and the evidence does not establish TCE was used or released in Building 2129 while the United States owned the MIAD area. *See* Ex. 6500 (depicting buildings constructed during World War II to which the County acquired title in 1948 and subsequently leased to Aerodex in red; and buildings constructed during the period of the County's ownership and used by Aerodex or other County tenants in yellow).

20. The evidence does not establish TCE or any other chlorinated solvent was used at MIAD in the 1940s. Wartime shortages of chlorinated solvents, government supply and usage control regulations, and readily available, less costly substitutes made TCE usage there unlikely. (Exs. 5391, 5394–5396, 5407, and 5436–5438; and Test. of John B. Robertson). Stoddard Solvent and caustic solutions were commonly-used substitutes for TCE

during World War II. *Id. See also* Test. of Lorne Everett.

21. A 1942 Army Air Force Technical Order described the kinds and uses of a number of "aqueous" and "volatile" cleaner fluids, as well as five basic cleaning methods: open tank, spray cleaning, vapor cleaning, portable pressure type cleaning, and carbon removal. (Ex. 5396). This Technical Order stated: "Due to the lower cost and non-inflammability of the aqueous cleaners" they were to "be used wherever practical," and "[v]olatile cleaning fluids" were to "be used only where aqueous cleaners are found unsuitable." *Id.* at 1. The Technical Order also stated that although "[t]he use of trichlorethylene vapor for the removal of grease and oil from parts, prior to plating or refinishing, has been found to be highly satisfactory," (*id.* at 8), "[d]ue to the cost of trichlorethylene, it will be necessary to restrict the above cleaning method to depots . . . as are specifically authorized by the . . . Air Service Command . . . to employ this method of cleaning." *Id.* at 1. There is no evidence MIAD ever received such authorization.

22. The evidence fails to establish TCE was used in MIAD during the war in vapor degreasers in Building T–129, which later became Building 2129. Exhibit 1007 is an October 1944 purchase request for vapor degreasers not only for MIAD, but also for thirteen different Army facilities all over the United States. There is no evidence the degreasers were actually purchased, and if so, whether they were shipped to or arrived at MIAD. There is also no evidence they were ever installed in Building T–129 and put into use at MIAD.

23. Exhibit 1127 is a June 1944 diagram that bears no building number, and

---

**18.** Beginning in 1958, the Port Authority changed the numbering system for MIA buildings and for buildings that predated the County's ownership. The new numbering system added "200," "20" or "2" to the building numbers assigned when they were built during World War II. (Ex. 5149 at DCAD200312–379).

there is no evidence to support the County's claim it is a diagram of Building T–129. There is also no reference to vapor degreaser equipment on Exhibit 1127, and nothing on this diagram supports a claim that TCE was used there during the war.

24. However, assuming *arguendo,* the evidence did establish release of TCE during the Army Air Forces' engine overhaul operations at MIAD in 1944 and 1945, the evidence establishes this TCE would have either migrated to the east and southeast in the groundwater—away from the LMSWF—or naturally attenuated into harmless substances, long before the hydraulic capture zone of the LMSWF extended south to the MIAD area. Test. of John B. Robertson. Thus, it is extremely unlikely there would be any detectible quantity of this TCE or its degradation products left in the soil or groundwater forty or more years later, because of the biodegradation, volatilization, and dilution processes there. *Id.* Therefore, any releases by the Army Air Forces during the 1940s would have contributed little, if anything, to the environmental harm addressed by County cleanup actions from the 1980s to the present. The uncontradicted scientific evidence shows that until about 1970, the natural groundwater flow direction from the MIAD was to the east and southeast toward the Atlantic Ocean and away from the LMSWF to the north of MIA. (Exs. 1062, 5266A, 5289, 5294, 5299, 6491, 6491A, 6493, 6501, 6501A, 6502, and 6513; and Test. of John B. Robertson). In the 1970s, increased pumping at the LMSWF altered that groundwater flow by drawing water to the north from under much of MIA. *Id.*

25. Therefore, the evidence does not establish the County is entitled to equitable contribution for the conceded federal ownership between 1943 and 1948. Accordingly, to the extent Count I alleges the County is entitled to contribution from the United States for ownership and operation during the World War II period, the Court shall enter judgment in favor of the United States.

■ 26. Turning to the U.S. Air Force lease, the evidence establishes in 1948, the Port Authority leased 144.26 acres of MIAD to the United States, along with more than forty buildings for the U.S. Air Force Reserve Training Center, later known as the Air Reserve Flying Center, under Lease No. W–08–123–eng–994. (Ex. 5). However, in 1959, the County and the United States negotiated terms for the removal of the U.S. Air Force Reserve units that were leasing space at MIAD. (Ex. 5754). In 1961, the U.S. Air Force Reserve vacated the MIAD areas it leased, although the lease agreement itself was not terminated until 1966. (Ex. 5754; Ex. 5377 at MA000105CEJ).

27. The evidence fails to establish the U.S. Air Force Reserve used chlorinated solvent in the MIAD areas it leased and occupied between 1948 and 1961. (Ex. 6488; and Test. of John B. Robertson). The U.S. Air Force Reserve used the following facilities: administration, fueling and lubrication, maintenance hangar, warehouse, quarters, mess hall, dispensary, parking, and recreational buildings and areas. The primary activities and operations conducted in the leased area were the air transportation of troops and their equipment and supplies, as well as reservist personnel flight training, aircraft fueling and lubrication, aircraft maintenance and cleaning, automobile parking and repair, and storage. (Exs. 5, 5754, 5119, and 5130; and Dep. of Earl Coffey).

28. Lease No. W–08–123–eng–994 was amended many times from 1948 to 1961 to reflect additions or deletions of leased areas. Exhibit 6488 depicts in green and pink all areas and structures leased from the County and occupied by the U.S. Air

Force at any time during the period of 1948 to 1961. All other areas shown on Exhibit 6488 were owned, occupied, and used by others.

29. Therefore, the evidence does not establish the County is entitled to equitable contribution for the conceded federal ownership relating to the U.S. Air Force lease from 1948 to 1966. Therefore, to the extent Count I alleges the County is entitled to contribution from the United States as a result of the U.S. Air Force Lease, the Court shall enter judgment in favor of the United States.

30. During the pendency of this case, the County has advanced other miscellaneous theories of federal ownership liability, which are arguably set forth in the Complaint. The Court will consider each of these miscellaneous theories in turn.

31. From the early 1950s to the mid–1970s, Aerodex leased its MIAD facilities from the County.[19] Aerodex's MIAD facilities and operations were located just southwest of the intersection of NW 25th Street and NW 67th Avenue [20] and included many of the buildings constructed by the Army for temporary use only during World War II. (Ex. 5600 at MADCAD 03456–57). The evidence fails to establish the U.S. Air Force was a party to any of the leases or amendments between Aerodex and the County or was named as a beneficiary or otherwise in any of those agreements. The reference to the federal use and other deed provisions was clearly and only to put the tenant, Aerodex, on notice that its use and occupation of the leased premises might be interrupted un-

der certain circumstances. See, e.g., Ex. 5047 (1955 lease) at MA002305EPA.

32. The evidence also fails to establish the United States owned any of the Aerodex-occupied buildings, other facilities, or land in the 1950s through the early–1970s. The leases between Aerodex and the County provided title to the improvements on the leased property—either new construction or improvements of existing buildings made at Aerodex's sole cost—vested in the Port Authority, free and clear of any liens or other encumbrances. See, e.g., Ex. 5055 at MA002344EPA–345EPA, MA002355EPA.

33. The evidence fails to support the County's additional arguments that the United States owned the small portion of pipe extending from the MIAD onto FEC Railway property during the 1950s through the 1970s and therefore, that the United States controlled Aerodex's waste disposal system. The evidence also fails to support the County's claim the United States leased any part of the Aerodex industrial waste system under Building 2005.

34. In 1963, a portion of the FEC Borrow Canal was dammed off to form what is referred to as the "Aerodex Pond." (D.E. No. 155, at 14). See also Ex. 235 and Test. of Kristen Stout (the Aerodex Pond and the earthen cofferdam separating the pond from the rest of the FEC Borrow Canal appear on a December 1963 aerial photograph, but do not appear on a January 1963 aerial photograph). The land on which the Aerodex Pond was located has at all relevant times been owned either by the FEC Railway or by the County. (Ex.

19. In the early 1950s, Aircraft Engine Services, Inc. ("AES") leased MIAD Buildings 2001, 2002, and 2005 for its engine overhaul operations. (Compl.¶¶ 127–129). In January 1954, Aerodex acquired and merged with AES. Aerodex continued engine overhaul operations in the buildings formerly occupied by

AES in the MIAD Area. (Complaint ¶ 131; Ex. 5602 at MADCAD 03455; and Ex. 1012 at 2).

20. Prior to the early 1970s, NW 25th Street had been called NW 10th Street. In various documents, NW 67th Avenue was also called Ludlum Road or Weatherford Boulevard.

6318 at ¶¶ 96–103). The County is the current owner of the property and has owned the property since 1992. (Ex. 205 at 5.) The evidence fails to establish the United States owned Aerodex Pond.

35. While the United States does not dispute that the U.S. Air Force owned many of the aircraft engines, parts, and containers on which Aerodex worked, ownership of these engines, parts, and containers is not relevant. The aircraft engines, parts, and containers were neither the places where hazardous substances were disposed of and came to be located, nor where the cleanup efforts have been and will be concentrated. *See United States v. Northeastern Pharm. & Chem. Co.*, 810 F.2d 726, 743 (8th Cir.1986), *cert. denied,* 484 U.S. 848, 108 S.Ct. 146, 98 L.Ed.2d 102 (1987) (holding the relevant CERCLA facility is the place where the hazardous substances were disposed of and where clean-up efforts have been concentrated). In this case, no hazardous substances were disposed of or placed in the aircraft engines, parts, or containers while at Aerodex, nor is the County seeking response costs associated with the remediation of aircraft engines, parts, or containers. Rather, the County is seeking costs related to remediation of the part of MIA property, including the buildings and land facilities leased by Aerodex from the County. Therefore, the engines, parts, and containers are not relevant CERCLA facilities. *Id.* at 743. *See also ACC Chem. Co. v. Halliburton Co.*, 932 F.Supp. 233, (S.D.Iowa 1995) (holding a manufacturing site was the relevant CERCLA facility for purposes of past owner or operator liability, not a truck from which the hazardous substance was pumped into barrels or landfill at the manufacturing site). Therefore, the evidence fails to establish the United States is liable as a past owner under any of the miscellaneous theories advanced by the County.

36. In sum, the evidence fails to establish the County is entitled to equitable contribution from the United States as a result of the conceded federal ownership. The evidence also fails to establish the United States is liable as a former owner beyond the United States' concession of federal ownership. Therefore, the Court shall enter judgment in favor of the United States on Count I in its entirety.

## C. The County Failed to Prove the United States is Liable as a Past Operator

37. Under CERCLA, a past "operator" of a facility at the time of disposal of hazardous substance is potentially liable pursuant to 42 U.S.C. § 9607(a)(2). *See United States v. Bestfoods,* 524 U.S. 51, 66–67, 118 S.Ct. 1876, 141 L.Ed.2d 43 (1998); *City of N. Miami,* 283 F.3d at 1302; *United States v. Vertac Chem. Corp.,* 46 F.3d 803, 808–09 (8th Cir.1995). *Accord State of Wash. v. United States,* 930 F.Supp. 474 (W.D.Wash.1996); *Maxus Energy Corp. v. United States,* 898 F.Supp. 399 (N.D.Tex.1995), *aff'd,* 95 F.3d 1148 (5th Cir.1996); *Rospatch Jessco Corp. v. Chrysler Corp.,* 962 F.Supp. 998 (W.D.Mich.1995); *United States v. Taylor,* No. 1:90:CV:851, 1993 WL 760996, at *19–20 (W.D.Mich. Dec.9, 1993).

38. In Counts III and IV, the County essentially alleges the United States is liable as a past operator as a result of activities performed for and at the direction of the United States by Aerodex and other private maintenance companies, including Air International, American Airmotive, Butler Aviation, Eastern, Pan Am, and Pan Am Ferries.

39. This case is not the first time a federal court has had occasion to consider whether the United States is liable as an operator arising from government contracts with private companies for defense-

related services. For example, the United States points to *United States v. Taylor* as instructive. 1993 WL 760996 (W.D.Mich. 1993). In *Taylor*, the United States District Court for the Western District of Michigan dismissed with prejudice a CERCLA counterclaim against the U.S. Army based on a supply contract for munitions between the U.S. Army and the defendants during the Vietnam War. *Id.* at *18–20. The *Taylor* court concluded product "specifications," government financial assistance, government employees with offices at the site to monitor product quality, and government contract cost auditing procedures were not enough to establish operator liability. *Id.* The *Taylor* court held:

> It is clear ... that the Army did not have the authority under the contracts to truly control the operations of Morweld or its waste handling practices. Although the proposed processes to be used by Morweld in the manufacture of the projectiles had to be approved by the Army, *Morweld had control over what it proposed and control over the actual processes employed.*

*Id.* at *18 (emphasis added). The *Taylor* court added, despite general allegations of U.S. Army involvement, there was no evidence "the Army ever, in any sense, attempted to control the daily operations of Morweld." *Id.*

40. The United States also alleges *Rospatch Jessco Corp. v. Chrysler Corp.* is instructive. 962 F.Supp. 998 (W.D.Mich. 1995). In *Rospatch*, the United States District Court for the Western District of Michigan granted summary judgment for the United States on the CERCLA operator claims and rejected the claim that the United States operated a Michigan aircraft engine factory in the early 1950s. *Id.* at 1005–06. The *Rospatch* court held it was insufficient that the U.S. Air Force: had many representatives at the plant during the · installation of government-owned equipment; kept a representative who worked out of an office at the plant during the manufacturing operations; and determined whether or not it would compensate the contractor for overtime worked by contractor employees during contract performance. *Id.* at 1005. In *Rospatch*, the court found the U.S. Air Force did not get involved in the contractor's "management of its operations" or "management decisions," and the contractor was not forced into doing the work, but rather had sought out the work. The *Rospatch* court further held the United States did not "involve[ ] itself in the manner of [the contractor's] production· of the R–1300 engine, · except inasmuch as the specifications mandated specific production methods." *Id.* at 1006. The *Rospatch* court concluded "the mere presence of an Air Force representative at the ... plant does not indicate that the Air Force interfered with the manner of [the contractor's] production of the engines since this representative merely monitored the quality control of the engines to ensure that they satisfied the contract specifications." *Id.* at 1006.

41. In contrast, the County alleges the United States Court of Appeals for the Third Circuit's decision in *FMC Corp. v. United States Dept. of Commerce*, 29 F.3d 833 (3d Cir.1994) (*en banc*), is instructive. In *FMC*, the Third Circuit considered whether the government had "substantial control" over a facility and had "active involvement in the activities" at the facility. · *Id.* at 843. The Third Circuit found:

> The government determined what product the facility would manufacture, controlled the supply and price of the facility's raw materials, in part by building or causing plants to be built near the facility for their production, supplied equipment for use in the manufacturing process, acted to · ensure that the facility retained an adequate labor force, participated in management and supervision of

the labor force, had the authority to remove workers who were incompetent or guilty of misconduct, controlled the price of the facility's product, and controlled who could purchase the product. *Id.* at 843. The Third Circuit held that "[g]iven this degree of control, and given the fact that the wastes would not have been created if not for the government's activities, the government is liable as an operator." *Id.* at 844.

42. However, the Third Circuit's reasoning in *FMC* does not assist this Court, because *FMC* is with inconsistent *Bestfoods*. In *United States v. Bestfoods*, the United States Supreme Court held:

> [U]nder CERCLA an operator is simply someone who directs the workings of, manages, or conducts the affairs of a facility. To sharpen the definition for purposes of CERCLA's concern with environmental contamination, *an operator must manage, direct, or conduct operations specifically related to pollution,* that is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations.

524 U.S. at 66–67, 118 S.Ct. 1876 (emphasis added). Thus according to *Bestfoods,* to determine whether the United States is liable as a past operator, this Court must examine the actions of the United States to determine whether such actions constitute direction or management of operations as specifically related to pollution. *Accord Jacksonville Elec. Auth. v. Bernuth Corp.,* 996 F.2d 1107, 1110 (11th Cir.1993) (holding "CERCLA contemplates 'operator' liability based only on a person's actions").

43. In this case, the evidence and argument presented have focused overwhelmingly on the relationship between the United States and Aerodex. The County has failed to show the United States is liable as a past operator by virtue of its relationship with other private maintenance companies, including Air International, American Airmotive, Butler Aviation, Eastern, Pan Am, and Pan Am Ferries. To the extent the County alleges the relationship between the United States and Aerodex is illustrative of the relationship between the United States and these other private maintenance companies, this has not been established. Therefore, the Court shall enter judgment in favor of the United States on Count IV in its entirety.

▪ 44. Accordingly, the Court will focus on whether the evidence establishes the United States managed, directed, or conducted operations specifically related to pollution at Aerodex, such that the United States is liable as a past operator of Aerodex. *Bestfoods,* 524 U.S. at 66–67, 118 S.Ct. 1876.

45. No one employed by the federal government ever filled any of the management or supervisory positions at Aerodex. The evidence before the Court shows federal personnel did not operate the engine work assembly line or direct Aerodex employees in their daily work. No one from the federal government was involved with the hiring or firing of Aerodex employees.

46. The four partial contracts between Aerodex and the United States contain provisions requiring federal inspection. This activity was performed by U.S. Air Force Quality Assurance personnel who monitored quality by checking a small percentage of the decisions made by Aerodex's larger inspection and quality control staff. (Dep. of Earl Coffey; Ex. 156 at MA000447WPB–449WPB; Ex. 254 at MA000463WPB–464WPB; Ex. 256; Ex. 259; Ex. 385 at MA000230WPB–231WPB; Ex. 1012; Ex. 5422 at MA000255SAN–257SAN; Ex. 5541; and Ex. 5552). The evidence fails to establish Aerodex personnel consulted federal personnel on waste disposal matters or that federal inspectors had any duties or responsibilities for waste

disposal matters at Aerodex during the 1950s through 1970s.

47. Although the complexity of aircraft engines and their critical role in aviation necessitated federal inspection, the U.S. Air Force inspectors did not assume Aerodex facility management duties or direct Aerodex workers in their work. Federal government employees who administered the U.S. Air Force contracts, including those actually stationed at the Aerodex plant, had no objective, duty, or responsibility other than to enforce the price, schedule, and other contract provisions by ensuring the delivery of quality products in accordance with the terms of the contract and otherwise protecting the interests of the federal government.

48. The leases between Aerodex and the County allocated waste management responsibilities between them and made no reference to any such U.S. Air Force responsibilities. For example, Aerodex's July 1961 Lease stated:

> "Maintenance of sanitary sewer mains, storm sewer mains and outfall ditches and canals are the responsibility of the Lessor. *The Lessee shall equip all industrial waste outfall lines with grease interceptors approved by the [Port] Authority.* The maintenance of all grease interceptors, sanitary sewer laterals, storm sewer laterals, manholes, catch basins and inlets located on, under, or within the parcels herein demised are the responsibility of the Lessee."

Ex. 5059 at MA002374EPA (emphasis added).

49. The June 1967 Lease between the County and Aerodex provided:

> The Lessee shall discharge all sanitary wastes, neutralized and treated industrial waste and foreign material into the sanitary sewage system *only*. All industrial waste and foreign material must be neutralized and treated as required by the Metropolitan Dade County Anti–Pollution Ordinance, *and in a manner satisfactory to the [Port] Authority,* the Florida State Board of health, and other public bodies, Federal, State, County or Municipal, having jurisdiction over, or responsibility for prevention of pollution of canals, streams, rivers and other bodies of water.

> The Lessee's introduction of objectionable waste into any component of the Authority's sanitary or storm drainage systems shall be deemed a default and a cause of immediate cancellation of this Agreement, any other provision of this Agreement to the contrary notwithstanding.

Ex. 5071 at DOJ001927 (first emphasis by italics added). This lease also specified "Lessee [Aerodex] shall provide, operate and maintain adequate facilities for neutralizing and treating industrial waste and foreign materials and the proper disposal thereof." *Id.* at DOJ001919.

50. Inspection and quality assurance for the U.S. Air Force engine overhaul work done by Aerodex employees was primarily the responsibility of other Aerodex employees. A 1961 U.S. Air Force report stated:

> Aerodex made substantial revisions in their own quality control organization and procedures. The chief of Aerodex quality control was elevated to Director status lateral to the Director of Production. The working quality control staff was augmented to approximately 313 persons. This quality control strength approached, in certain critical areas, 15% of the production work force. Aerodex quality control procedures had been revised and approved by the Air Force quality control office, work areas and conditions had been improved, and quality control data was being translated into improved production procedures.

Ex. 385 at MA000230WPB. U.S. Air Force audits thereafter showed "a substantial improvement in the quality of the engines being overhauled by Aerodex." *Id.* at MA000231WPB. "The vast improvement, as indicated by these quality control audits, supported the position that the contractor's revised quality control system would be adequate for performance of the contract subsequently extended." *Id. See also* Ex. 156 at MA000447WPB and Ex. 254 at MA000463WPB–464WPB.

51. In the 1950s, the number of U.S. Air Force quality assurance personnel stationed at Aerodex generally ranged between six and twelve. (Exs.5541, 256, 259). In 1961, the number of U.S. Air Force quality control personnel resident at Aerodex was increased to twenty-five, "almost doubl[ing] the previously assigned strength." Ex. 385 at MA000230WPB. In contrast, during the 1960s there were hundreds or at times thousands of Aerodex employees engaged in such work. (Ex. 1012 at 18; Ex. 5552; Dep. of Earl Coffey; Dep. of Jean Marcotte; and Dep. of Marvin Spallina).

52. The deposition testimony of Mr. Coffey, a former civilian U.S. Air Force quality assurance inspector, does not support the County's claim that the United States exercised oversight and control over Aerodex waste disposal practices. Mr. Coffey worked at Aerodex from 1963 to 1971. He testified that the duties and responsibilities of U.S. Air Force Quality Assurance personnel at Aerodex were "to verify the contractor's quality decisions on the assembly and test of the aircraft engines;" to perform a "follow up verification of the contractor's [personnel] quality decision[s];" to "verify that the contractor had built or rebuilt or overhauled an Air Force engine to the specifications of his contract and all applicable tech data;" and to verify through quarterly plant surveys that work systems or areas of the Aerodex plant "were under the written control by the contractor and in actual application by the contractor throughout the plant." However, the "contractor had his own quality deficiency system," and his "quality inspectors would . . . write up various" problems in the daily work at Aerodex.

53. Mr. Coffey's deposition testimony parallels the instructions in Exhibit 5422, the applicable military specification concerning contractors' quality assurance programs. This military specification (MIL–Q–9858A) detailed the contractor's inspection and quality control responsibilities: "[e]ffective management for quality shall be clearly prescribed by the Contractor," (Ex. 5422, ¶ 3.1 at MA000255SAN); contractor "[m]anagement regularly shall review the status and adequacy of the quality program and provide for the special controls, processes, test equipments, fixtures, tooling and skills required for assuring product quality," (*id.* ¶¶ 3.2, 4.2 at MA000255SAN, 257SAN); contractor was required to prepare "clear and complete [work] instructions" to "provide the criteria for performing the work functions" and "for supervising, inspecting and managing work," (*id.* ¶ 3.3 at MA000255SAN–256SAN); "contractor shall maintain and use" records "essential to the economical and effective operation of the quality program," (*id.* ¶¶ 3.4, 3.6 at MA000256SAN); "contractor is responsible for assuring that all supplies and services procured from his suppliers (subcontractors and vendors) conform to the contract requirements," (*id.* ¶¶ 1.3, 5.1 at MA000254SAN, 257SAN); "[i]nspection and monitoring of processed material or products shall be accomplished in any systematic manner selected by the contractor," and "contractor shall establish and maintain an effective and positive system for controlling nonconforming material, including procedures for identification, segregation, and disposition," (*id.* ¶¶ 6.2, 6.5, 6.7 at MA000260SAN–261SAN).

54. Mr. Coffey's deposition testimony shows only Aerodex personnel, and not employees of the federal government, were responsible for the function and operation of Aerodex facilities and for the handling and disposal of any wastes, including that resulting from the Aerodex cleaning tanks Mr. Coffey described and from other Aerodex equipment. Mr. Coffey's deposition testimony shows he never directed Aerodex workers in hosing down or mopping up chemical spills on floors, and he had no involvement with how or where Aerodex disposed of wastes. *Id.* In all, Mr. Coffey understood it was not his job to manage Aerodex's operations.

55. In his deposition testimony, Mr. Coffey described three cleaning rinse bath vats in one part of the Aerodex plant and a vapor degreaser located elsewhere in that facility. Mr. Coffey did not have knowledge or responsibilities as to maintenance of the liquid in the vapor degreasing equipment or what happened to the chemical used in the vapor degreaser when the chemical could no longer be used.

56. The evidence shows the use of TCE in vapor degreasers is an entirely different operation from the immersion of parts into the series of open rinse vats filled with air-agitated liquids as described by Mr. Coffey in his deposition testimony. The use of TCE vapor for the removal of grease and oil from engine parts generally occurs in an enclosed tank to prevent or reduce the evaporation of the TCE. In this process, the parts are suspended midway in the empty portion of a degreasing chamber and are cleaned when the vapors rising from heated TCE in the bottom of the tank condense on the cooler surfaces of the parts. The condensed vapor then drops off as a liquid, carrying with it the dirt, grease, and oil to be removed into the bottom of the degreasing chamber. (Exs. 837 and 838—Air Force Technical Manual T.O. 2J–1–13 at ¶ 2–11; and Ex. 5396—

AAF Technical Order No. 1–1–1 at 8 (November 12, 1942)).

57. Mr. Coffey was apparently mistaken in thinking TCE was the chemical used in one of the open air vats of air-agitated liquids he described. This is supported by the fact that initially Mr. Coffey recalled the vats held Varsol or kerosene. This minor confusion on a matter not within Mr. Coffey's area of responsibility is not material.

58. From the 1950s through the 1970s, Aerodex waste management matters were governed solely by Aerodex executives and Port Authority personnel. (Exs. 78, 84, 1012, 5510–5518, 5532, 5553, 5577, and 5653). There are no documents describing U.S. Air Force duties, responsibilities, or actions regarding Aerodex's waste management decisions, personnel, practices, or facilities. Aerodex personnel were responsible for the handling of wastes from Aerodex engine overhaul operations, including the handling of waste barrels and the cleaning of chemical spills on the floors down into floor drains. The evidence shows Aerodex, the Port Authority, and the U.S. Force understood these issues were controlled and managed entirely by Aerodex and the Port Authority.

59. The Aerodex Pond and cofferdam remained visible in aerial photographs from March 1964 through January 1971. *Id.* A December 1973 photograph shows that the Aerodex Pond had been filled in by that point in time. *Id.* November 1979, February 1980, and March 1987 aerial photographs show the earthen fill remaining in place and vegetated. *Id.* By 1988, asphalt pavement covered the former waste pond area. *Id. See also* Ex. 5286 at MA0000521EPA. The evidence fails to establish the U.S. Air Force participated in, funded, or directed the damming of the Aerodex Pond in 1963, the filling in between 1971 and 1973, or the paving over in

the 1980s. *See, e.g.,* Exs. 5239, 5795, and 5809.

60. Wastes from the Aerodex buildings, where most of the engine overhaul work occurred, were discharged into underground storm and sewer lines. The wastes then traveled approximately 725 feet from those buildings underneath NW 25th Street and discharged into the FEC Borrow Canal and later the Aerodex Pond portion of the canal. (D.E. No. 155, at 14). The evidence fails to establish U.S. Air Force personnel inspected the Aerodex Pond or had any responsibilities concerning discharges into it.

61. The evidence fails to establish there existed a contemporaneous belief or understanding by anyone that the U.S. Air Force, or any other federal agency, was responsible for or involved in operations creating wastes or industrial waste management of Aerodex or other MIA tenants or for making decisions about Aerodex's compliance with environmental laws and regulations.

62. A large volume of clear and convincing contemporaneous documents shows the Port Authority knew pollution from Aerodex and other tenants was traveling away from MIA. Although the Port Authority studied the problem and consulted with various tenants, including Aerodex, the evidence does not establish the Port Authority consulted the U.S. Air Force about this problem. *See e.g.,* Exs. 5036–5080, 5154, 5157–5159, 5162, 5163, 5165, 5166, 5168–5170, 5236–5239, 5247, 5248A, 5255, 5256, 5260, 5262, 5604, 5611, 5624–5617, 5622, 5627, 5635, 5637, 5638, 5643, 5647, 5649, 5650, 5659, 5661, 5664, 5747, 5762–5764, 5776, 5782, 5795, 5801, 5802, 5804, 5806, 5809, 5810, 5818, 5818A, 5834, 5852, and 6307.

63. Therefore, the evidence shows the limited role of the U.S. Air Force inspectors at Aerodex was consistent with standard federal procurement practices nationwide. *See also Johns–Manville Corp. v. United States,* 13 Cl.Ct. 72, 115 (1987), *vacated on jurisdictional grounds,* 855 F.2d 1571 (Fed.Cir.1988); *Shuman v. United States,* 765 F.2d 283, 292–293 n. 7 (1st Cir.1985). The presence and activities of U.S. Air Force inspectors at Aerodex are insufficient to support the County's claim that the U.S. Air Force, thereby, became an "operator" of Aerodex and subject to CERCLA liability. *See Bestfoods,* 524 U.S. at 66–67, 118 S.Ct. 1876; *City of N. Miami,* 283 F.3d at 1302; *Vertac Chem. Corp.,* 46 F.3d at 808–09; *Taylor,* 1993 WL 760996; *Rospatch,* 962 F.Supp. at 998; *State of Wash. v. United States,* 930 F.Supp. 474, 483–85 (W.D.Wash.1996) (presence of inspectors insufficient to prevent summary judgment for the United States); *Maxus Energy Corp. v. United States,* 898 F.Supp. 399, 402 (N.D.Tex. 1995) (summary judgment granted for the United States even with federal inspectors at the contractor's plant to determine compliance with contract specifications), *aff'd,* 95 F.3d 1148 (5th Cir.1996). All of these decisions are consistent with and remain good law after *Bestfoods.*

64. In sum, the evidence fails to establish the United States managed, directed, or conducted Aerodex's operations specifically related to pollution. *Bestfoods,* 524 U.S. at 66–67, 118 S.Ct. 1876. Accordingly, the Court shall enter judgment in favor of the United States on Count III in its entirety.

**D. The County Failed to Prove the United States is Liable as an Arranger**

65. CERCLA section 107(a)(3) imposes liability on "any person who by contract, agreement, or otherwise arranged for the disposal ... of hazardous substances owned or possessed by such person" at a facility. 42 U.S.C. § 9607(a)(3).

66. In assessing potential arranger liability cases, courts have focused on various factors and the evidence in the case, rather than establishing bright-line tests. *See Concrete Sales & Services, Inc. v. Blue Bird Body Co.*, 211 F.3d 1333, 1336–37 (11th Cir.2000) (per curiam); *South Florida Water Mgmt. Dist. v. Montalvo*, 84 F.3d 402, 406–407 (11th Cir.1996); *United States v. Aceto Agric. Chemicals Corp.*, 872 F.2d 1373, 1377, 1380 (8th Cir.1989); *Dedham Water Co. v. Cumberland Farms Dairy, Inc.*, 805 F.2d 1074, 1081 (1st Cir. 1986); *State of New York v. Shore Realty Corp.*, 759 F.2d 1032, 1045 (2d Cir.1985). Such factors include:

(1) whether a sale involved the transfer of "waste" or of a "useful" product; (2) whether the party intended to dispose of a substance at the time of the transaction; (3) whether the party made the "critical decision" to place hazardous substances in the hands of a particular facility; (4) whether the party had knowledge of the disposal; and (5) whether the party owned the hazardous substances.

*Concrete Sales*, 211 F.3d at 1336–37 (citations omitted). No particular factor is dispositive. *Id.*

67. As explained by the United States Court of Appeals for the Second Circuit:

[T]here must be some nexus between the potentially responsible party and the disposal of the hazardous substance.... This nexus is premised upon the potentially liable party's conduct with respect to the disposal or transport of the hazardous wastes.... In other words, Congress employed traditional notions of duty and obligation in deciding which entities would be liable under CERCLA as arrangers for the disposal of hazardous substances. Accordingly, this court concludes that it is the *obligation* to exercise control over hazardous waste disposal, and not the mere ability or opportunity to control the disposal of hazardous substances that makes an entity an arranger under CERCLA's liability provision.

*General Elec. Co. v. AAMCO Transmissions, Inc.*, 962 F.2d 281, 286 (2d Cir.1992) (citations omitted). *See also United States v. Shell Oil Co.*, 294 F.3d 1045, 1055–60 (9th Cir.2002), *cert. denied*, 537 U.S. 1147, 123 S.Ct. 850, 154 L.Ed.2d 849 (2003).

68. In *Concrete Sales*, two companies contracted for metal parts electroplating services by Peach Metal Industries ("PMI") and had other dealings with PMI. "Both customers"—Blue Bird and Simplex—"set electroplating standards and returned any unsatisfactory work to PMI to be re-done." 211 F.3d at 1335. Blue Bird was "PMI's biggest customer," "outsourc[ing] all of its electroplating to PMI" and using "blueprints and purchase orders" that "instructed PMI as to the type and thickness of the coating to be electroplated to [Blue Bird's] parts." *Id.* "Both [customers] had some awareness of the possibility of a waste problem at PMI," both customers knew that wastes would be generated, and "Blue Bird ... could have exercised control over PMI's hazardous waste disposal practices," because it made loans to PMI for the purchase of hazardous substances. *Id.* at 1336–37. Neither customer controlled PMI's disposal actions. *Concrete Sales*, 211 F.3d. at 1336–38. The hazardous wastes were inherent in the processes, and PMI disposed of the wastes by dumping them into unlined lagoons and on the ground, and by storing them in drums at its Georgia facility. *Id.* On these facts, the United States Court of Appeals for the Eleventh Circuit held the companies did not arrange for PMI's disposal of wastes from the metal-plating operations, by stating it "would stretch the meaning of 'arranged for' beyond a reasonable reading of [CERCLA]" to hold either

customer liable under the CERCLA. *Id.* at 1339.

69. In alleging the United States is liable as an arranger, the County presents the same evidence and argument presented in support of its allegations of past operator liability. As discussed, *supra,* this evidence and argument focus predominantly on the relationship between Aerodex and the United States. The County has failed to show the United States is liable as an arranger by virtue of its relationship with other private maintenance companies, including Air International, American Airmotive, Butler Aviation, Eastern, Pan Am, and Pan Am Ferries. To the extent the County alleges the relationship between the United States and Aerodex is illustrative of the relationship between the United States and these other private maintenance companies, this has not been established.

70. As discussed *supra,* the evidence fails to establish the United States managed, directed, or conducted operations specifically related to pollution at Aerodex. The evidence shows the U.S. Air Force was a customer who hired Aerodex and paid for overhaul and repair services-including Aerodex's management and supervision of that work-under terms and conditions similar to those afforded to Aerodex's commercial customers. Aerodex waste management matters were governed solely by Aerodex executives and Port Authority personnel. (Exs. 78, 84, 1012, 5510–5518, 5532, 5553, 5577, and 5653). The U.S. Air Force used visiting or resident inspection personnel to ensure the work agreed upon and paid for was done on schedule. *See, e.g.,* Exs. 156, 254, 385, and 5358 at MA00070DAR. For the same reasons discussed, *supra,* the evidence fails to establish the United States: contracted with Aerodex to transfer waste; intended to dispose of waste in transacting with Aerodex; made the critical decision to place hazardous substances in the hands of a particular facility; and had knowledge of the disposal. *Concrete Sales,* 211 F.3d at 1336–37. Therefore, the Court will focus on whether the United States owned the hazardous substances used by Aerodex to perform the engine overhaul service contracts.

71. The available 1959 and 1968 contract terms also show that TCE was not a "direct material" for which Aerodex was reimbursed, and which the U.S. Air Force therefore owned. Thus, the evidence fails to establish the U.S. Air Force paid for or owned any of the TCE used by Aerodex and therefore, also fails to establish the U.S. Air Force owned or arranged for the disposal of the TCE wastes by Aerodex.

72. The contract excerpts and Mr. Jordan's uncontradicted expert testimony show that "direct materials" were defined in Aerodex contracts with the U.S. Air Force as replacement parts or other items that actually became part of the engines and excluded cleaning chemicals used or consumed during Aerodex's work on them. Under all of these contracts, therefore, items which were used or consumed during contract performance, such as chemicals and materials used for cleaning engines, engine parts, engine containers or engine accessories, were not made "integral parts" of the items being overhauled or repaired, were not related to the operational function of the engine or part, and thus, fell outside the definition of "direct materials." Accordingly, under the contract these were "indirect materials." Therefore, the price of those chemicals were included in the fixed unit prices specified in these contracts, were not separately reimbursed by the U.S. Air Force, and those costs were paid by Aerodex and any chemicals purchased were owned by Aerodex alone. (Test. of Tommy B. Jordan).

73. The 1959 contract definition of "direct material" was:

[A]ll items purchased, supplied, manufactured, or fabricated by the Contractor, as approved by the Administrative Contracting Officer and delivered to the Government which enter directly on or into the engine, engine part or engine accessory being overhauled which is identified with and has application to the operational function of said engine, engine part, or engine accessory to include, in addition, ventilator protex covers, dehydrators, humidity cards, engine bags, engine envelopes and outside shipping containers. Any item other than those specified and mentioned herein, which is necessary in processing the engine, engine part or engine accessory after overhaul to the point of acceptance by the Government for shipment, shall not be included in the definition of "Direct Materials" for reimbursement purposes.

Ex. 17, at 5. Thus, the government-furnished property or material under this contract was limited to parts and did not include consumable chemicals. Such "other materials required [we]re to be furnished by the Contractor and the cost therefor is included in the fixed unit price(s) and hourly rate specified in this Contract Schedule." *Id.* at 12.

74. In the January 1968 Contract, "direct material" was defined as "all items which the Contractor ... purchases, supplies from stock, manufactures, or fabricates and specifically identifies for the performance of this Contract with the intention of entering them into or making them a part of the engine, engine parts, shipping containers, or engine accessories being overhauled/modified." (Ex. 5501 at 8).

75. In the September 1968 Contract, the definition of "direct material" was the same as the language in the January 1968 contract. (Ex. 5502 at AA0650800). It further provided that "Fuel and oil will be Government–Furnished Property." *Id.* at AA0650790.

76. The October 1968 Contract No. F34601–69–C–0098 (Ex. 22 at AA650694–718), provided that "direct materials" were only those items which were "purchased, supplied or fabricated by the Contractor for the express purpose of making them integral parts of the repaired, overhauled, or modified" engines. *Id.* at AA0650705–06. This contract also stated: "Government–Furnished Property is authorized," and "Fuel and Oil required in the performance of this contract shall be furnished by the Government. The petroleum, oil and lubricant items shall be furnished by the Government subject to General Provisions clause hereof entitled 'Government Property.'" *Id.* at AA0650695.

77. As in the 1959 contract, the October 1968 contract also stated:

The Contractor shall furnish replacement parts and materials in support of the items of work to be performed under this Contract in accordance with the provisions of Appendix "B" hereto. Notwithstanding any other provisions of this Contract, ... "direct materials" are hereby defined as those materials which are purchased, supplied or fabricated by the Contractor for the express purpose of making them integral parts of the repaired, overhauled, or modified items of equipment or components ....

The Contractor shall furnish the supplies coded "GFP" ... to the extent the Government is unable to furnish same, provided the need for the Contractor to furnish such supplies is verified by the Contracting Officer.

*Id.* at AA0650705–06. Finally, the Schedule with this contract contained a list of "Government–Furnished Property," which included equipment, machinery, tools, fix-

tures, but did not list chemicals. Each listed item included its "Tool Number[ ]." *Id.* at AA0650711.

78. Therefore, the available contract excerpts are consistent with the 1948 and 1963 Armed Service Procurement Regulations policy in this regard. (Exs. 5358 and 5362). The May 19, 1948 Armed Services Procurement Regulation (Ex. 5358 at MA00047DAR–68DAR) stated:

It is the general policy of the Armed Services that *Contractors will furnish all materials required for the performance of Government contracts.* Exceptions to this policy may be made by a procuring activity when it is determined that it will be in the best interest of the Government to furnish materials in a particular case, or with respect to a particular type of procurement, by reason of economy, standardization, expediting production, or other circumstances.

*Id.* at MA00050DAR (emphasis added). *See also* Ex. 5362 at MA000507DAR–508DAR (March 1, 1963 Armed Services Procurement Regulation stating the same).

79. The deposition testimony of former U.S. Air Force personnel who worked at Aerodex, and of former Aerodex personnel, also confirms the U.S. Air Force often provided government-owned parts and equipment for Aerodex to use and special fuels to use in engine testing, but Aerodex commercially bought and furnished its own chemicals for cleaning engines. (Dep. of Jean Marcotte; and Dep. of Marvin Spallina).

80. Although the County offered contrary testimony by Dayton Smith, the Court finds this 50–year old general recollection is unreliable.

81. Another County witness, Stanley Apte, admitted he had no specific recollection of the U.S. Air Force ever reimbursing Aerodex for any solvents Aerodex used, including TCE.

82. There is no evidence the U.S. Air Force actually reimbursed or paid Aerodex for any TCE which Aerodex used in working on U.S. Air Force engines, or that Aerodex made any requests for such reimbursement. Thus, the evidence fails to establish the U.S. Air Force actually owned, reimbursed, or paid Aerodex for any TCE, which Aerodex used in working on U.S. Air Force engines, or that Aerodex made any requests for such reimbursement.

83. The evidence also does not support the County's claim the United States required that Aerodex use TCE. (Test. of John B. Robertson). Even assuming, *arguendo,* such a requirement would be relevant to alleged "operator" or "arranger" liability, this requirement would have been contained within U.S. Air Force Technical orders and would have been made applicable to contracts with Aerodex by specific contract references to the Technical Orders. The available contract excerpts do not reference any technical orders, let alone relevant technical orders. (Exs. 17, 22A, and 5501). Therefore, the evidence fails to establish the United States owned and provided TCE or other chlorinated solvents to Aerodex to use in the performance of the Aerodex engine overhaul service contracts.

84. In sum, the evidence fails to establish the United States managed, directed, or conducted Aerodex's operations specifically related to pollution. *Concrete Sales,* 211 F.3d at 1336–37. Accordingly, the Court shall enter judgment in favor of the United States on Count II in its entirety.

**E. The County Failed to Prove a Joint Venture Between Aerodex and the United States**

85. Count V of the Complaint (¶¶ 224–228) recasts the County's past operator allegations in the form of an alleged joint

venture between Aerodex and the U.S. Air Force and an alleged relationship as "co-venturers." *See* 42 U.S.C. § 9601(21) (CERCLA's definition of "person" includes a "joint venture").

■■■■ 86. To determine whether a joint venture exists, federal courts look to state law as applied to the specific facts of each case. *See Edward Hines Lumber Co. v. Vulcan Materials Co.*, 861 F.2d 155, 158 (7th Cir.1988); *United States v. USX Corp.*, 68 F.3d 811, 826–27 (3d Cir.1995); *United States v. Consol. Rail Corp.*, 729 F.Supp. 1461, 1468–70 (D.Del.1990). Joint ventures, like partnerships, are created by an actual contract or agreement, either express (written or oral), or implied from the conduct of the parties.

■■■ 87. To prove a joint venture under Florida law, the evidence must show all of the following: (1) all the essentials of an ordinary contract, including an intent to enter into a contract; (2) a community of interest in the performance of a common purpose; (2) joint or shared control or right of control over operations, personnel, and facilities; (3) joint ownership interest in the venture's business; (4) a right to share in the profits; and (5) a duty to share in any losses that may be sustained. *Williams v. Obstfeld*, 314 F.3d 1270, 1275–76 (11th Cir.2002); *Hyman v. Regenstein*, 258 F.2d 502, 512–13 (5th Cir.1958);[21] *Austin v. Duval County Sch. Bd.*, 657 So.2d 945, 947–49 (Fla. 1st DCA 1995) (no joint venture between county school board

and City of Jacksonville); *Kislak v. Kreedian*, 95 So.2d 510, 514–16 (Fla.1957).

88. "[W]here, as in this case, the events and transactions which form the basis of the alleged relationship are not in writing, the burden of establishing the existence of such a contract . . . is indeed, as it should be, a heavy and difficult one," because "[b]usiness relationships are not customarily entered into in a casual manner." *Kislak*, 95 So.2d at 515. In *Edward Hines*, the United States Court of Appeals for the Seventh Circuit held in the CERCLA "operator" context, a prerequisite to finding a joint venture is a "willingness to be joint venturers, shared control, and division of the profits and losses." 861 F.2d at 158.[22]

■■■ 89. As stated by the Florida Supreme Court in *Kislak*, "[t]he very fact that the agreement was not reduced to writing is evidence, however slight, that no such agreement actually existed." 95 So.2d at 515. In this case, no available document in evidence from the 1950s through the early 1970s refers to or reveals the existence or terms of any contract for a joint venture between Aerodex and the U.S. Air Force, including documents in which one would expect to find such an important matter described, such as the annual reports by Port Authority consultants concerning MIA operations and facilities (Exs.5142–5172) and Aerodex filings with the Securities and Exchange Commission between 1968 through 1974

21. In *Bonner v. Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

22. Alleged joint ventures have been considered by the courts under CERCLA in a number of other cases. *See, e.g., USX Corp.*, 68 F.3d at 826–27 (genuine issues of material fact as to knowledge and intent precluded

summary judgment on whether joint venture existed); *Consol. Rail Corp.*, 729 F.Supp. at 1468–70 (evidence on motion for summary judgment showed no joint venture); *Hellenic Lines, Ltd. v. Commodities Bagging & Shipping, Process Supply Co.*, 611 F.Supp. 665, 679–81 (D.N.J.1985) (joint venture shown by oral agreements in meetings of parties, joint property ownership interests, shared control, and other conduct of parties).

(Exs.5510–5518). The evidence fails to establish when the alleged joint venture was formed, how it was formed, how the assent of the United States to be a joint venturer was manifested, who did so on behalf of each party, whether any profits or losses were ever shared, whether there was any jointly owned property at MIAD, and how and when the joint venture was terminated.

90. The evidence also fails to establish the actual existence of a joint venture or to show an intent of the parties to form a joint venture. For example, the evidence does not establish that under their fixed-price contracts the United States and Aerodex had the right to share profits or the duty to share losses. Fixed-price contracts, by definition, indicate services are being provided for a specific price, even if the actual costs of the contractor turn out to be more or less than the contractor believed when it bid. (Test. of Tommy B. Jordan). Thus, the available evidence shows Aerodex, as the contractor, kept any and all profits it earned and bore any and all losses it incurred in performing work under these U.S. Air Force contracts. The "value engineering" clauses in the contracts between the United States and Aerodex provide no evidence of shared profits and losses. (Test. of Joan K. Meyer).

91. In all, the evidence before the Court, including thousands of documents spanning the 1950s through early 1970s, fails to establish the existence a joint venture between Aerodex and the U.S. Air Force or any agency of the United States. Accordingly, the Court shall enter judgment in favor of the United States on Count V in its entirety.

92. Furthermore, Count VI seeks declaratory relief under CERCLA that the United States is liable to the County for the United States' allocable share of the cost incurred and costs to be incurred in response to releases or threatened releases of hazardous substances at or from the facilities at MIA. Because the County has failed to bear its burden as to Counts I–V, Count VI fails as a matter of law, and the Court shall enter judgment in favor of the United States on Count VI in its entirety.

**F. The County is Statutorily Barred from Alleging a RCRA § 7002 Claim**

 93. Count VII is a RCRA citizens' suit by which the County seeks a preliminary and permanent injunction ordering the United States to undertake, perform, and pay for any further responses, investigations, assessments, or corrective actions necessary in connection with the releases of solid wastes, hazardous substances, pollutants, contaminants, and petroleum products caused or contributed to by the United States that may present an imminent and substantial endangerment in or around MIA.

94. Section 7002 of RCRA allows private citizens to institute civil litigation in limited circumstances. To ensure citizen suits are not duplicative or disruptive of EPA or state remediation efforts, section 7002(b)(2)(B) bars citizen suits in certain instances where the EPA or a state has acted to address the alleged endangerment. 42 U.S.C. § 6972(b)(2)(B). *See generally Acme Printing Ink Co. v. Menard, Inc.*, 812 F.Supp. 1498, 1506–09 (E.D.Wis.1992); *McGregor v. Indus. Excess Landfill, Inc.*, 709 F.Supp. 1401, 1407–08 (N.D.Ohio 1987). Specifically, section 7002(b)(2)(B)(iii) states:

> No action may be commenced under subsection (a)(1)(B) of this section if the Administrator, in order to restrain or abate acts or conditions which may have contributed or are contributing to the activities which may present the alleged endangerment—... (iii) has incurred costs to initiate a Remedial Investigation and Feasibility Study under section 104

of the Comprehensive Environmental Response, Compensation and Liability Act . . . and is diligently proceeding with a remedial action under that Act.

42 U.S.C. § 6972(b)(2)(B)(iii).[23] Thus, the need for private citizens to commence actions to correct environmental hazards arises "[o]nly when the federal or state governments fail to act to remedy the situation or file suit in either State or federal courts due to inadequate public resources." *McGregor*, 709 F.Supp. at 1407.

95. Here, the EPA has already addressed vinyl chloride groundwater contamination through its Biscayne Aquifer clean-up. The aquifer study area consisted of an eighty-square mile area, which specifically included and analyzed MIA. (Ex. 5276 at CTY00379–0003 to 006). As part of the remedial investigation/feasibility study ("the RI/FS"), the EPA identified VOCs as the primary contaminant, with "[v]inyl chloride [ ]as the most common contaminant detected." *Id.* at CTY00379–0011. Due to the high transmissivity of the groundwater in the study area, EPA could not identify all sources of VOCs. Nevertheless, the EPA concluded a substantial portion of the contamination was very likely released from MIA and two other sources. *Id.* at CTY00379–0011 to 0015. The EPA also concluded there were a number of unidentified sources of contamination in the study area. *Id.* at CTY00379–0055.

96. After careful review and consideration of the RI/FS and public comments from the surrounding community, including the County, the EPA selected a remedy under CERCLA section 106, as detailed in its 1985 ROD. Specifically, the EPA chose to install air-stripping towers at the LMSWF water treatment facility to treat the contaminated water prior to its release

to the public drinking supply. (Ex. 5276 at CTY00379–0042–CTY00379–0047). The purpose of these air-stripping towers was to address the contamination from MIA as well as all other unidentified sources contributing to groundwater in this eighty-square mile area. *Id.* Pursuant to its CERCLA authority, the EPA issued a formal determination, via its Biscayne Aquifer ROD, that this remedy would not only provide safe public drinking water, but also result in "a significant cleanup of the contaminated portion of the aquifer." *Id.* at CTY00379–00054. After construction of the air-stripping towers, the EPA certified in 1993 that its remedy was fully operational, met the applicable treatment standards for VOCs in drinking water, and that "no further Superfund action [was] necessary to protect human health and the environment." (Ex. 5304 at MA000892EPA, 900EPA). These air-stripping towers will continue to operate until VOCs levels in the groundwater of the Biscayne Aquifer are below regulatory limits. (Ex. 5276 at CTY00379–0054).

97. Because the EPA incurred costs from completing a RI/FS and diligently proceeded with implementing a remedial action to address contamination of groundwater in the Biscayne Aquifer, RCRA section 7002(b)(2)(B)(iii) bars the County from seeking any additional relief. Accordingly, the Court shall enter judgment in favor of the United States on Count VII in its entirety.

G. **The Court Lacks Jurisdiction Over Counts VIII, IX and X Brought Pursuant to Florida Statutes and the Miami–Dade County Code**

98. Counts VIII, IX, and X alleges claims for contribution and other relief

---

**23.** RCRA defines "Administrator" as "Administrator of the Environmental Protection Agency." 42 U.S.C. § 6903(1).

under state law, Fla. Stat. §§ 376.313 and 403.727, and Chapter 24 of the Miami–Dade County Code. The County alleges the United States has waived sovereign immunity for claims under CERCLA pursuant to § 120(a) of CERCLA, 42 U.S.C. § 9620(a) and for claims under RCRA pursuant to §§ 6001(a) and 7002(a) of RCRA, 42 U.S.C. §§ 6961(a), 6972(a). (Compl. at ¶ 193).

■■■ 99. Federal courts have no jurisdiction to hear a claim against the United States absent a waiver of sovereign immunity. *FDIC v. Meyer*, 510 U.S. at 475, 114 S.Ct. 996; *United States v. Sherwood*, 312 U.S. at 586, 61 S.Ct. 767.

■■■ 100. Waivers of sovereign immunity must be unequivocally expressed. *United States v. King*, 395 U.S. 1, 4, 89 S.Ct. 1501, 23 L.Ed.2d 52 (1969); *United States Dep't of Energy v. Ohio*, 503 U.S. 607, 615, 112 S.Ct. 1627, 118 L.Ed.2d 255 (1992). Waivers of sovereign immunity must be narrowly construed in favor of the sovereign. *McMahon v. United States*, 342 U.S. 25, 27, 72 S.Ct. 17, 96 L.Ed. 26 (1951); *United States v. Idaho*, 508 U.S. 1, 113 S.Ct. 1893, 123 L.Ed.2d 563 (1993). This principle applies fully to environmental statutes. *See United States Dep't of Energy v. Ohio*, 503 U.S. 607, 618–20, 112 S.Ct. 1627, 118 L.Ed.2d 255 (1992).

■■■ 101. The County, as Plaintiff, bears the burden of establishing subject matter jurisdiction and must show Counts VIII, IX, and X fall within the scope of an explicit waiver of sovereign immunity. *See Lundeen v. Mineta*, 291 F.3d 300, 304 (5th Cir.2002) (burden on plaintiff to show waiver of sovereign immunity); *Menchaca v. Chrysler Credit Corp.*, 613 F.2d 507, 511 (5th Cir.1980) (same); *Rosner v. United States*, 231 F.Supp.2d 1202, 1205 (S.D.Fla. 2002) (same).

■■■ 102. Prior to trial, the Court held that as a matter of law the CERCLA

waiver of sovereign immunity applies only to facilities currently owned or operated by a department, agency, or instrumentality of the United States. (D.E. No. 177). The United States is not a current owner or operator of facilities at MIA. Therefore, the United States has not waived sovereign immunity to suit under state law or the County Code by virtue of the CERCLA waiver.

■■■ 103. Accordingly, the Court's focus is whether the RCRA waiver applies and permits the County to seek recovery pursuant to state law and the County Code. RCRA section 6001 waives sovereign immunity to current Government action as follows:

> Each department, agency, and instrumentality of the executive, legislative, and judicial branches of the Federal Government (1) *having jurisdiction* over any solid waste management facility or disposal site, or (2) *engaged in any activity resulting, or which may result,* in the disposal or management of solid waste or hazardous waste shall be subject to, and comply with, all Federal, State, interstate, and local requirements, both substantive and procedural (including any requirement for permits or reporting or any provisions for injunctive relief and such sanctions as may be imposed by a court to enforce such relief), respecting control and abatement of solid waste or hazardous waste disposal and management in the same manner, and to the same extent, as any person is subject to such requirements, including the payment of reasonable service charges.

42 U.S.C. § 6961(a) (emphasis added).

104. MIA has been designated as a FUDS site. The Defense Environmental Restoration Program ("DERP") statute allows the U.S. Army Corps of Engineers to perform CERCLA response actions at cer-

tain types of properties including "[e]ach facility or site which *was* under the jurisdiction of the Secretary and *owned by, leased to, or otherwise possessed by* the United States at the time of actions leading to contamination by hazardous substances." 10 U.S.C. § 2701(c)(1)(B) (also known as Formerly Used Defense Site provision) (emphases added). Nothing in the language of this section requires the Department of Defense to clean up all sites that are designated FUDS sites. (Ex. 5386 at ¶ 4.a).

105. The DERP statute, 10 U.S.C. § 2701 *et seq.*, does not contain any waiver of sovereign immunity with regard to any state or local laws or RCRA.

106. From the plain language of § 6001, it is clear that Congress has waived sovereign immunity only with respect to solid waste management facilities or solid waste disposal sites over which the Government has current "jurisdiction." 42 U.S.C. § 6961(a). Although jurisdiction is not defined in RCRA, a "fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning." *Morante–Navarro v. T & Y Pine Straw, Inc.*, 350 F.3d 1163, 1167–68 (11th Cir.2003) (citing *Perrin v. United States*, 444 U.S. 37, 42, 100 S.Ct. 311, 62 L.Ed.2d 199 (1979)). The ordinary meaning of jurisdiction over real property implies legal control or power. *See American Heritage Dictionary of the English Language* (4th Ed.2000).

107. This Court has already held that "by statutory definition a FUDS site is no longer owned by the United States. Thus the United States does not own or operate MIA by virtue of its designation as a FUDS site." (D.E. No. 177). This Court has also held that the United States is not an owner of the MIA by virtue of selected provisions in the 1948 deeds which conveyed titled to MIA from the United States to the County. (D.E. No. 178).

108. At all relevant times in the 1990s to the present, the Aviation Department has controlled who has access to air-side areas of MIA, which are the areas not open to the public. Pedro Hernandez, Chief of MIA's Environmental Engineering Department, testified he was not aware of anyone from the U.S. Army Corps of Engineers ever entering either air-side areas or MIA tenant facilities without Aviation Department permission. MIA Aviation Department permission would be required before the U.S. Army Corps of Engineers or any federal agency could conduct soil excavation, take soil samples, install groundwater monitoring wells, remove liquid storage tanks, or install and operate air-stripping systems. (Test. of Pedro Hernandez). The U.S. Army Corps of Engineers has never been involved in the Aviation Department's cleanup actions at MIAD or NWCA or given the County any direction or instruction regarding cleanup actions.

109. In all, the evidence fails to establish the designation of MIA as a FUDS site confers control of MIA to the United States sufficient to trigger RCRA's waiver of sovereign immunity. Accordingly, the Court does not have jurisdiction over Count VIII, IX, or X of the Complaint and therefore, Counts VIII, IX, and X shall be dismissed.

## H. Conclusion

110. The Court shall enter judgment in favor of the United States on Counts I–VI in their entirety, because the evidence does not establish the County is entitled to relief as alleged. As a result, the Court does not reach issue of whether the County's alleged response costs are "necessary" under CERCLA. 42 U.S.C. § 9601(25);

*Ascon Properties, Inc. v. Mobil Oil Co.,* 866 F.2d at 1152–53.

111. The Court will also enter judgment in favor of the United States on Count VII in its entirety, because § 7002(b)(2)(B)(iii) of RCRA bars the County from seeking any additional relief.

112. The Court does not have jurisdiction over Count VIII, IX, or X of the Complaint, which alleges claims against the United States pursuant to state law and the County Code. Therefore, Counts VIII, IX, and X shall be dismissed.

113. While not dispositive, the Court notes after careful consideration of the record, including voluminous documentary evidence, there is a strong inference the parties most responsible for the environmental contamination at and around MIA are not parties to this suit.

114. Any of the foregoing conclusions of law which may represent findings of fact are adopted as findings of fact. *See Miller v. Fenton,* 474 U.S. at 114–15, 106 S.Ct. 445. The Court retains jurisdiction for the purpose of awarding attorney's fees and costs. It is hereby:

**ORDERED AND ADJUDGED that**

1. Pursuant to Rule 58 of the Federal Rules of Civil Procedure, judgment shall be entered by separate written order in accordance with these Findings of Fact and Conclusions of Law.

2. All pending motions not otherwise ruled upon are DENIED as moot.

3. This case is CLOSED.